**UNITED STATES of America, Plaintiff,**

v.

**Marva TINGLING a/k/a Jacinth Miles and Beverly A. Drummond, Defendants.**

No. 86–00262–01/02–CR–W–8.

United States District Court, W.D. Missouri, W.D.

March 27, 1987.

Linda L. Sybrant, Asst. U.S. Atty., Kansas City, for plaintiff.

Bruce W. Simon, Kansas City, for defendants.

## MEMORANDUM AND ORDER

STEVENS, District Judge.

The court has before it the Report and Recommendation of the Honorable Calvin K. Hamilton, Chief United States Magistrate, filed January 28, 1987, in which Judge Hamilton reluctantly recommends that this court enter an order granting defendants' joint motion to suppress physical evidence and statements, if any, made by them. Having reviewed the record and the applicable law, the court finds that the arrests in this case were supported by probable cause, and that therefore defendants' joint motion to suppress should be denied.

### I. *The Facts*

The court adopts the Chief Magistrate's proposed findings of fact relevant to the present motion, which are reproduced in an appendix to this order. Those facts can be summarized as follows.

1. For about a month prior to the arrests herein, Detective Robert Starbuck had been assigned part-time to what may be called a narcotics interdiction detail at Kansas City International Airport. Starbuck's supervisor had learned through informants that the late-night Eastern Airlines flight into Kansas City from Miami had become particularly popular with cocaine traffickers. In addition, Drug Enforcement Agency officials assigned to

monitor the airplane during its layover stop in St. Louis had reported to Starbuck's superiors a high level of drug-related seizures on that leg of the flight.

2. Informants had also told Starbuck's superiors that the preferred method of smuggling on this late-night Eastern flight was to conceal large quantities of cocaine on the courier's person. According to informants, the couriers on the late-night Eastern flights were often black women of Jamaican descent. Further, in the several weeks prior to the arrests herein, the Kansas City authorities had observed Jamaicans known to be involved in cocaine trafficking picking up passengers from these Eastern flights.

3. At about 9:40 p.m. on December 2, 1986, Starbuck took up surveillance of Eastern flight 222, scheduled to arrive at 10:15 p.m. at gate 6A from Miami, via St. Louis. At about 10:00 p.m. he noticed a new 1987 white turbo Mazda parked near gate 10. Two black men got out of the car, entered the terminal, and checked the arrival-time monitors. Shortly thereafter, Starbuck noticed that the same car was parked right outside gate 6A. His curiosity evidently piqued, Starbuck exited the gate area, walked past the Mazda, and observed the two men slumped down or lying down in the front seat of the car in such a fashion that they could not be seen by casual passers-by.

4. Starbuck resumed his surveillance position inside the terminal near gate 6A. Flight 222 arrived late at 10:40 p.m. While Starbuck was waiting for the passengers to deplane, one of the men who had been seated in the Mazda entered the terminal and took up a position a few feet to Starbuck's left, such that both he and Starbuck were standing directly in front of the gate as the passengers disembarked. Starbuck noticed that this individual would from time to time glance over in Starbuck's direction, but that when Starbuck returned the glance, he would turn away.

5. Although he couldn't remember this individual's name, Starbuck recognized him as someone with whom he had had contact in the past in the context of at least one if not several drug investigations. He was later identified through fingerprints as Carl Stroud, although he identified himself as James Anderson.

6. Defendants disembarked the plane separately and exited the terminal separately. From all initial appearances, it seemed as though defendants were strangers to one another and to Stroud—they left the gate area without acknowledging one another or Stroud—yet as soon as defendants had exited the terminal, Stroud followed them out and they all headed for the Mazda.

7. Starbuck observed defendant Tingling getting into the back seat of the Mazda and observed defendant Drummond placing her luggage in the trunk, assisted by the driver (who was later identified as Lloyd Archer, a Jamaican). At this juncture, Stroud was walking toward the car and as he observed Starbuck drawing closer, he hesitated and backed away momentarily. Starbuck then approached the car, identified himself to defendant Drummond, and inquired whether he might speak with her.

8. Though it appears that defendant Drummond was quite agreeable throughout the ensuing colloquy, she lied repeatedly about her identity and citizenship. She claimed she had come to Kansas City to visit a friend (pointing to Archer) but she could not name Archer, nor did she know his address or telephone number. It developed that Drummond was a Jamaican citizen travelling on a one-way ticket paid for in cash and issued under a false name.

9. Defendant Drummond gave Starbuck verbal and written permission to search her luggage and purse. Though the search revealed no contraband, Starbuck found it odd that none of the luggage bore identification tags.

10. Starbuck then made similar inquiry of defendant Tingling. She too lied about her identity, and was travelling on a one-way ticket paid for in cash and issued under a false name. She consented to a search of her baggage; the search revealed no contraband. None of her baggage bore

identification tags. She could, however, identify Archer by name.

11. Archer informed Starbuck that he was a Jamaican national who had been in the United States since 1981. He told Starbuck that he had just left a house at Peery and Bellefontaine, where someone named John (whose true name Archer thought was Mike Campbell) had instructed him to pick up two women at the airport. Archer further stated that Stroud had been at the house and had accompanied him from the house to the airport.

12. Starbuck recognized the place described by Archer as one which had been the subject of a prior drug investigation, and which was known to be the residence of numerous Jamaican nationals involved in cocaine activity.

13. Starbuck attempted to make inquiry of Stroud, but he chose not to cooperate.

14. Archer gave Starbuck oral permission to search the Mazda. The search revealed a loaded handgun and ammunition beneath the driver's seat.

15. Starbuck then advised Archer and Stroud that he was placing them under arrest for carrying a concealed weapon. He advised defendants that he was placing them under arrest for giving false information to a police officer. Defendants were informed of their *Miranda* rights.

16. During the course of the booking procedure at the police station, the female officer who searched defendant Tingling discovered two packets of cocaine in her undergarments. Defendant Drummond then admitted that she too was carrying cocaine; a search revealed three packets hidden in similar places. Defendant Tingling stated that she had been given the contraband by unknown persons in Miami, with instructions to transport it to Kansas City, where unknown persons would pick her up at the airport.

The question before the court is whether, on this record, Detective Starbuck had probable cause to believe defendants were violating narcotics laws when he placed them under arrest.

## II. *Discussion*

The Constitution permits an officer to arrest a suspect without a warrant if there is probable cause to believe that the suspect has committed or is committing an offense. *Michigan v. DeFillippo*, 443 U.S. 31, 36, 99 S.Ct. 2627, 2631, 61 L.Ed.2d 343 (1979) (citations omitted). "Probable cause" means those facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense. *Id.* at 37, 99 S.Ct. at 2632 (citations omitted).

The Supreme Court has recently emphasized that probable cause is a "practical, nontechnical conception." *Illinois v. Gates*, 462 U.S. 213, 231, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983) (quoting *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949)). The probable cause standard does not deal with hard certainties, but rather, as the term itself implies, with probabilities. "[L]ong before the law of probabilities was articulated as such, practical people formulated certain *common sense conclusions about human behavior;* jurors as factfinders are permitted to do the same—*and so are law enforcement officers.*" *Id.* at 231–32, 103 S.Ct. at 2328–29 (quoting *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)) (emphasis added). Probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. *Id.* at 243 n. 13, 103 S.Ct. at 2335 n. 13. In making a determination of probable cause the relevant inquiry is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of noncriminal acts. *Id.* See also *United States v. Glasser*, 750 F.2d 1197, 1205–06 (3d Cir.1984), *cert. denied*, 471 U.S. 1018, 105 S.Ct. 2025, 85 L.Ed.2d 306 *and* 471 U.S. 1068, 105 S.Ct. 2148, 85 L.Ed.2d 504 (1985) (applying *Gates* explication of probable cause standard in a warrantless arrest context).

The pivotal question in this case, in the court's view, is whether the information Detective Starbuck gathered during his airport surveillance and upon stopping and questioning defendants and their two male companions escalated the factual basis from one permitting an investigatory stop to one warranting an arrest.[1] *See United States v. Martin,* 706 F.2d 263, 265 (8th Cir.1983). In the court's view, no one item of the government's evidence, considered in isolation, would have been sufficient to establish probable cause here. However, although Starbuck's investigation uncovered no "smoking gun," it is not every case in which a suspected drug courier is so indiscreet as to travel with unusual bulges in his clothing, *see United States v. Ilazi,* 730 F.2d 1120 (8th Cir.1984), or so incautious as to virtually admit that he is carrying contraband, *see United States v. Mancini,* 802 F.2d 1326 (11th Cir.1986). Nor does the probable cause standard require an interdiction officer to develop such damning evidence during the *Terry*-stop phase of his investigation in order to establish probable cause. Rather, the appropriate question is whether there came a time at which a succession of superficially innocent events had proceeded to the point where a reasonably cautious man could say to himself that an innocent course of conduct was substantially less likely than a criminal one. *United States v. Patterson,* 492 F.2d 995, 997 (9th Cir.1974), *cert. denied,* 419 U.S. 846, 95 S.Ct. 82, 42 L.Ed.2d 75 (1974).

In the court's opinion, at some point between the time Starbuck first approached defendant Drummond and the time he placed defendants and their companions Archer and Stroud under arrest, events had proceeded to the point where a reasonably cautious person would say, based on common sense conclusions about human behavior, that defendants were substantially less likely to be tourists travelling to Kansas City incognito than persons trafficking in drugs. A reasonably cautious person would not expect actually to see cocaine dribbling from Ms. Drummond's or Ms. Tingling's undergarments in order to arrive at this conclusion. Here, in the court's view, the critical point was reached and crossed when Archer revealed that he had been instructed by a person of shadowy identity to meet defendants at the airport and to drive them to a house at Peery and Bellefontaine, a location which Starbuck recognized as having been involved in a prior cocaine investigation. Further, he knew that numerous Jamaican nationals who were involved in cocaine activity resided at this very location. Archer further revealed that Stroud, whom Starbuck thought he recognized from an earlier drug investigation, was in fact present at that location and had accompanied Archer from that location to the airport.

This information at a minimum allowed Starbuck to confirm in his own mind the link he thought existed between Stroud and drug trafficking, and presented him with more than an unparticularized hunch as to what kind of enterprise Stroud, Archer, and those persons they might meet at the airport would likely be engaged in. These revelations cast into sharp and telling relief the furtive behavior of defendants and their companions upon deplaning, defendants' total lack of identification, their repeated lies about their identity and citizenship, and their one-way tickets purchased in cash under false names. In the court's view, the probable cause jigsaw was sufficiently complete when Archer's revelations were pieced in with these parts of the puzzle.

The ultimate question in this case is, where on a scale from "mere guess" to "proof beyond a reasonable doubt" did the facts and circumstances within the contemplation of Detective Starbuck on the evening of December 2, 1986 fall? No doubt he had at least a reasonable suspicion that defendants were cocaine couriers and no doubt he did not have unequivocal proof.

---

1. The Chief Magistrate found that Starbuck conducted a proper "investigatory stop" under the principles set forth in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Report and Recommendation at 23. Upon review of the record and the applicable law, most notably *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) and *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), the court concurs in this finding.

The difficult problem is how much additional information is required to ripen a reasonable suspicion into probable cause. This quantity cannot be determined in the abstract: it depends upon both the nature and quality of that information and the court's own view of the expectations of the hypothetical reasonably cautious, prudent person. The determination necessarily turns on the facts of the given case.

Here, Starbuck knew the late-night Eastern flight had become popular with traffickers. He knew that many seizures had been made during the flight's stop in St. Louis. He knew the preferred method was concealment on the person. He knew that persons known to be local traffickers had been recently observed picking up passengers from these flights. He saw defendants, persons matching a general courier description provided by informants, arrive on one of these flights and observed their strange behavior at the gate. He knew they had been met at the airport by someone he recognized from a previous drug investigation, and who too had acted strangely at the gate and at the car. He knew that defendants had tried to hide their true identity and citizenship. He knew their baggage bore no identifying tags, and that each defendant was travelling under false names on one-way tickets purchased in cash. He knew that the welcoming committee had just arrived from a house connected with cocaine activity. He knew that they were under instructions to take defendants straight from the airport to this location. Each of these elements could be given an innocent explanation but a more likely explanation, one at which a reasonably cautious person would arrive, was that Starbuck was witnessing the unfolding of the same drama the authorities knew had been played out on these flights in the recent past.

Having concluded that Detective Starbuck had probable cause to arrest defendants for violating narcotics laws,[2] it follows that the contraband found on their persons during a search incident to their arrests was lawfully seized. *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *United States v. Phillips*, 607 F.2d 808 (8th Cir.1979) (search during "booking" process). Further, because defendants were properly informed of their *Miranda* rights, and because nothing in the record suggests that the statements made by defendants after the contraband was discovered were improperly elicited, any statements so made were lawfully obtained.

For the foregoing reasons, it is

ORDERED that defendants' joint motion to suppress physical evidence and statements is denied.

### Appendix

#### (Reproduced from the Report and Recommendation of the Chief Magistrate)

1. For three or four weeks prior to December 5, 1986, Starbuck was assigned on a part-time basis to investigate narcotics trafficking at Kansas City International Airport (hereafter, "the airport") (Transcript of consolidated preliminary examination and detention hearing [hereafter, "Tr."], at 5). Starbuck was at the airport on December 2, 1986, and had instructions to specifically watch for black female persons of Jamaican descent who may be transporting cocaine by concealing large supplies on their person and who were arriving from the Miami, Florida, area on evening flights of Eastern Airlines (Tr. at 5–7, 59–61). Starbuck was given that description based on information which had been relayed to Starbuck's superiors by informants (Tr. at 6–7). Miami and southern Florida are believed to be the origination of large supplies of cocaine (Tr. at 7). Although Starbuck had a description, he did not have any specific information on any particular persons or on these defendants in particular (Tr. at 61);

---

**2.** The court joins in the Chief Magistrate's finding that neither defendant violated Kansas City, Missouri Code § 26.16 or R.S.Mo. § 575.060, provisions dealing with making false reports to public authorities, and that therefore their arrests cannot be supported by reference to these provisions. *See* Report and Recommendation at 15–20.

2. Having been assigned to interdiction detail, Starbuck arrived at the airport at 4:00 p.m., December 2, 1986, in plain clothes and armed, accompanied by police officers David Reynolds (hereafter, "Reynolds") and Jerry Gallagher (hereafter, "Gallagher") (Tr. at 5–6, 7, 9–10, 46). Starbuck was at the Eastern Airlines terminal all evening (Tr. at 8). About 9:40 p.m. or sooner, Starbuck was in the immediate vicinity of Gate 6A of the Eastern Airlines terminal, where Flight 222 was scheduled to arrive (Tr. at 8);

3. About 10:00 p.m., December 2, 1986, Starbuck noticed a new 1987 white turbo Mazda automobile with a dealer's license plate in the rear window but with no license plates as it was parked at the entrance to the Eastern Airlines ticket counter, near Gate 10 of Terminal A (Tr. at 8–9, 43–44). Two black males arrived in the car, entered the terminal, and checked the monitors which showed the arrival times of flights (Tr. at 8). Several minutes later Starbuck noticed the same car had moved and was parked with the engine running directly outside Gate 6A where Starbuck was (Tr. at 8–9). Starbuck walked outside and, as he walked by the car, saw the two black males slumped down or lying down in the front seats such that they could not be seen by anyone who did not walk by and look in the car (Tr. at 9). After seeing the two men in the car, Starbuck re-entered the terminal to await the arrival of Flight 222 (Tr. at 10). Under Kansas City ordinances, the car had an illegally displayed license plate and was parked for 40 minutes in a three-minute zone, but Starbuck did not approach the car (Tr. at 44).

4. At 10:40 p.m., Flight 222, which had been scheduled to arrive at 10:15 p.m., arrived from Miami via St. Louis at Gate 6A with about 40 passengers (Tr. at 7–8, 42). While Starbuck was waiting for the passengers to deplane, one of the black males from the white Mazda automobile entered the terminal from directly behind Starbuck, and stood a few feet to Starbuck's left such that both he and Starbuck were standing directly in front of the gate as the passengers disembarked (Tr. at 10, 14). The black male subsequently identified himself as James Anderson, although he was eventually identified, through fingerprints as Carl Stroud (hereafter, "Stroud") (Tr. at 11, 14). As they stood there, Starbuck noticed that Stroud glanced several times at Starbuck, and when Starbuck turned back around, then Stroud would turn (Tr. at 10–11). Starbuck recognized Stroud as someone with whom he'd had contact in the past in regard to drug investigations, but Starbuck could not recall Stroud's name (Tr. at 11, 59);

5. As they disembarked, the arriving airline passengers walked directly toward Stroud and Starbuck (Tr. at 11, 44). Starbuck saw the defendants among the disembarking passengers and noticed that the defendants were separated by 10 to 12 passengers as they initially came down the aisle or ramp when getting off the airplane (Tr. at 11–13, 43). The defendants were the only black persons that Starbuck observed among the arriving passengers (Tr. at 42). Defendant Tingling was carrying a lady's purse and a carry-on type piece of luggage with a kind of tweed material outside it while Defendant Drummond was carrying a brown nylon carry-on suitcase, a red Macy's shopping bag, and a large, straw woman's purse with a rainbow design on it (Tr. at 11, 13–14). Starbuck was standing about 15 to 20 feet from the defendants when they came off the airplane (Tr. 45). The defendants paused momentarily in front of Starbuck, then veered to their right and proceeded out one of the double doors (Tr. at 12, 14, 44). The two defendants did not acknowledge each other's presence, had no conversation with each other, and gave no indication that they were together (Tr. at 14). After the two defendants exited separately, Stroud suddenly turned and followed them out the same doors they had used, but Stroud and the defendants had no contact with each other (Tr. at 14–15, 58). Starbuck thought the behavior of the defendants and Stroud was peculiar in that Stroud appeared to have been waiting for the two defendants, who apparently were traveling together, but none of them acknowledged each other (Tr. at 45, 58–59). Upon noticing the de-

fendants' behavior, Starbuck turned toward them to follow them, and they began to walk rather hurriedly to the white Mazda car (Tr. at 15);

6. At the car the driver was standing with the trunk lid open, and the defendants hurriedly put their luggage in the trunk (Tr. at 15, 43). The driver later was identified as Lloyd Archer, a Jamaican (Tr. at 19). As Starbuck approached the car, he could see that Defendant Tingling had put her luggage in the trunk and was entering the rear seat of the car while Defendant Drummond was loading her luggage into the trunk (Tr. at 15). Meanwhile, Stroud was walking toward the car, and, when he saw Starbuck getting close to it, he hesitated and backed off for a few moments (Tr. at 15). Starbuck's first contact with the defendants occurred outside the terminal building at the white Mazda car, where he approached Defendant Drummond first and identified himself with his badge and identification card (Tr. at 15, 51);

7. Starbuck told Defendant Drummond his name and that he was with the Narcotics Unit of the Kansas City, Missouri, Police Department and that he would like to speak with her. (Tr. at 15–16). Defendant Drummond was very agreeable and began to talk with Starbuck (Tr. at 16). Starbuck explained he had been assigned to the airport to check for people who may be involved in narcotics trafficking (Tr. at 16). Starbuck asked her about her identity, her citizenship and the general nature of her travel (Tr. at 16). She handed to Starbuck an Eastern Airlines ticket, one-way paid in cash for Flight 222 from Miami to Kansas City, in the name of Betty Reid (Tr. 16–17, 47, 51). When Starbuck asked Drummond what her name was, she first said "White" and then quickly corrected herself and said "Betty Reid" while pointing to the ticket (Tr. at 17, 19–20, 47–48). Defendant Drummond gave an address of 2892 N.E. 104th Lane in Miami, Florida (Tra. at 41–42). At first she claimed to be an American, but, when Starbuck mentioned her Jamaican accent, she changed and said she was a citizen of Jamaica (Tr. at 17–18, 48). She said she had no passport, visa, immigration papers, or identification and gave no clear

indication of where such documentation was (Tr. at 18). When Starbuck said failure to carry some form of documentation by an alien resident was an immigration law violation, she responded that she was not aware of that (Tr. at 18). She said she came to Kansas City to visit a friend, and she pointed to the Mazda car driver, Lloyd Archer (Tr. at 18–19). However, when Starbuck asked her what the driver's name was, she said she didn't know because she knew him only as "P.Z." (Tr. at 19). She could not tell Starbuck what Lloyd Archer's telephone number was, where he lived, how he was contacted by her, or how he had come to meet her at the airport, although she said she knew Lloyd Archer from Jamaica (Tr. at 19);

8. Moments after Starbuck first approached the defendants, the other two officers came to the white Mazda car (Tr. at 45). Starbuck and the other two officers were armed and in plain clothes, and it was their intention that the defendants, Archer and Stroud, not be permitted to drive away in the car (Tr. at 46). Initially, Starbuck had not intended to stop the defendants, but when he saw how the defendants behaved as they were getting into the car, he decided to talk to them (Tr. at 46–47);

9. At the white Mazda car, Starbuck told Defendant Drummond that he would like to have her permission to search her luggage and purse (Tr. at 19–20). She asked him if he had a warrant, and he said he did not, but that he was strictly asking for her cooperation (Tr. at 27). Starbuck told her he would be searching for narcotics, large quantities of currency, narcotics paraphernalia, and weapons (Tra. at 20, 27). She gave verbal consent, and Starbuck suggested they step inside where it was warm; and when they were inside, he read to her a Kansas City, Missouri, Police Department Form 155 called "Consent to Search," which reads as follows:

'I hereby freely and voluntarily give my consent to officers of the Kansas City, Missouri, Police Department to conduct a search of and seize for evidence of narcotics trafficking. I understand that the officers have no search warrant authoriz-

ing this search and that I have a constitutional right to refuse permission for them to conduct the search, and any evidence found may be used against me in Court.'

(Tr. at 19, 20, 21, 22, 27–28). Defendant Drummond signed the consent form, using the name Betty Ried, which was spelled differently from the name "Betty Reid" on the airline ticket (Tr. at 19, 20, 21). Starbuck searched the luggage but found no evidence of drugs or contraband of any kind (Tr. at 49). Starbuck found only personal effects and clothes, and he thought it was odd that there was no form of identification or tags or anything with names on them (Tr. at 23). Although Starbuck had no reason to believe Defendant Drummond was in the United States unlawfully, he began to doubt her (Tr. at 49). Believing she had lied, Starbuck asked Defendant Drummond more questions (Tr. 49–50). She insisted that she had a Jamaican passport and that she had entered the United States with a passport in the name of Betty Reid, but when Starbuck told her that she had misspelled the name on the consent form and that he could check immigration records to confirm the passport, she became hesitant and then said her name was Beverly Allen (Tr. at 22–23). Starbuck said he could check immigration records to see if Defendant Drummond entered under a passport in the name of Beverly Allen and, after pausing for several moments, she said that Beverly Allen Drummond was her true name (Tr. at 23). When Starbuck asked again about her immigration status, in view of the fact she now had four different names, she became silent, so he ended the interview (Tr. at 23). Starbuck asked her if he should repack her luggage, and she said she would do it (Tr. at 24). Meanwhile, Defendant Tingling had remained in the back seat of the white Mazda car, while the other two police officers stood outside the car (Tr. at 22, 49).

10. One of the other officers stepped inside and remained with Defendant Drummond while Starbuck went to talk to Defendant Tingling (Tr. at 24, 50). Starbuck told Defendant Tingling his name, where he worked, and that he had been assigned to the airport to check for persons who may be involved in narcotics trafficking (Tr. at 24). Defendant Tingling was polite and cordial, and she stepped out of the car and agreed to talk to Starbuck (Tr. at 24). Defendant Tingling said she had no identification and that she was a citizen of Jamaica (Tr. at 24). She gave a name of Sandra M. Morris, birthdate of December 14, 1962, and an address of 2871 N.W. 204th Lane, Miami, Florida (Tr. at 25, 42). She said she had no identification, no passport, no visa, and no immigration papers even though she knew immigration law required her to carry documentation (Tr. at 25). She said she was a Jamaican citizen in the United States on an "unlimited visa," although she did not explain what that was (Tr. at 25). Starbuck saw the airline ticket, in the name of Sandra Morris, was a one-way cash payment ticket from Miami to Kansas City (Tr. at 25). She stated that she had come to Kansas City to visit a friend of hers, pointing to the driver and identifying him as Lloyd Archer (Tr. at 26). When Starbuck asked Defendant Tingling who her travel companion was, she identified Defendant Drummond first as Beverly and then quickly corrected herself and said the name was Betty Reid (Tr. at 26). When Starbuck asked Defendant Tingling for permission to search her carry-on luggage, she gave verbal consent, and Starbuck then asked if she would like to step inside where it was warm (Tr. at 26). Once inside, Starbuck read to Defendant Tingling the consent-to-search form; then she read the form and signed it in the name of Sandra Morris (Tr. at 26–27, Exhibit 2). Starbuck told her, and the form stated, that Starbuck would be searching for narcotics, currency, narcotics paraphernalia, and weapons (Tr. at 27). As he had with defendant Drummond, Starbuck explained that Defendant Tingling did not have to consent to the search of personal belongings, that he had no warrant, and that he was asking for cooperation (Tr. at 27). The consent form had the same statement on it as the one signed by Defendant Drummond (Tr. at 27–28; Exhibit 2). While he was searching her luggage, Starbuck asked Defendant Tingling whether immigration

records would show she had entered the country on a passport as Sandra Morris (Tr. at 28). She paused for quite a while, staring at Defendant Drummond, and Starbuck asked Defendant Tingling whether she had given her correct name (Tr. at 28). She then said that her name was Jacinth Miles, and she spelled it for Starbuck (Tr. at 28). When Starbuck asked her why she had lied about her name, she said it was because she had entered the United States in June, 1986, on a three-month visa and that the visa had expired, so she knew she was in the country illegally (Tr. at 28–29). Starbuck found no identification or labeling on Defendant Tingling or her belongings to suggest who she might be (Tr. at 29). He found no noteworthy items and found no controlled substances or contraband (Tra. at 29, 51). Defendant Tingling began repacking the suitcases (Tr. at 30). When Starbuck realized the defendants had given him false information and false names, and that he believed immigration laws had been violated by them, he decided to arrest the defendants (Tr. at 55–56);

11. When Defendant Tingling was repacking her suitcases, Stroud and Archer, who had been waiting in the white Mazda car, came inside the terminal because of the cold weather (Tr. at 30, 33–34). Starbuck asked the car's driver to produce his driver's license, and the Florida license identified him as Lloyd Archer (Tr. at 30). Archer said he was a Jamaican National who had been in the United States since 1981 (Tr. at 30). When asked for a passport and immigration papers, Archer said he didn't have any with him and that he thought they were locked up in Miami, although he was rather vague about where they were (Tr. at 30). In response to Starbuck's questions, Archer showed him a slip of paper indicating the white Mazda car had been purchased the day before by Hugh Anthony Gardner at an Olathe, Kansas, dealership with a $7,000.00 down payment (Tr. at 31–32). Archer said he was staying with Hugh Anthony Gardner and was using the car and that he had just left a house at Peery and Bellefontaine where he had been instructed by someone called John, whose true name he thought to be

Mike Campbell, to pick up two females at the airport (Tr. at 31, 32). Archer described the house as a big house on the corner of Peery and Bellefontaine (Tr. at 33). Starbuck recognized the place as one with which he was familiar from a cocaine investigation and which was inhabited by numerous Jamaican Nationals involved in cocaine activity (Tr. at 33). Archer said that Stroud was at the house and had accompanied him to the airport (Tr. at 31);

12. Starbuck attempted to interview Stroud, but Stroud became somewhat antagonistic and belligerent, so Starbuck concluded the interview shortly after he started talking with Stroud (Tr. at 36);

13. Starbuck asked Archer for permission to search the car (Tr. at 34). Archer gave permission to Starbuck, who explained to Archer that he would be looking for narcotics, weapons, currency, or paraphernalia (Tr. at 36). Starbuck completed another consent-to-search form, which Archer read but refused to sign, but said that Starbuck could search the car (Tr. at 34). After Starbuck verified the verbal consent to search the car, he and Officer Reynolds went to the car (Tr. at 34);

14. Inside the car Starbuck found a 9 mm, semi-automatic Glock handgun, loaded with a clip of 17 rounds, beneath the front seat, laying next to another clip containing another 17 rounds (Tr. at 34–35);

15. After finding the handgun, Starbuck walked back inside the terminal and placed Archer and Stroud under arrest on a charge of carrying a concealed weapon (Tr. at 36);

16. After arresting the two men, Starbuck arrested the two defendants inside the building, telling them they were being arrested for giving false information to a police officer and that he planned to contact the Immigration and Naturalization Service (Tr. at 36–37, 52, 54, 62). It had not been Starbuck's intention to arrest either of the defendants if they had refused to talk with him at the airport and ordinarily would not have arrested them if he had no concrete evidence to pursue the matter (Tr. at 55, 56).

17. After the arrests, Starbuck read to the two men their rights under *Miranda* and then walked over to the defendants, read their rights to them, and asked if they understood their rights, and they said they did (Tr. at 37);

18. Following the arrests, Starbuck, Reynolds, and Gallaher transported Defendants Drummond and Tingling from the airport to the downtown police station (Tr. at 37–38, 52). The three officers and two defendants stopped on the second floor of the police station to obtain an arrest approval form (Tr. at 38). While there, they asked for a female detention officer, which is normal procedure, outside life-threatening situations, when a female is arrested (Tr. at 38). Male officers normally do not search the persons of female prisoners, so the officers take female prisoners to a location where a female officer can search them prior to their entering the detention area (Tr. at 38);

19. Detention officer Juanita Winfrey (hereafter, "Winfrey") patted down the defendants and said she felt hard bulges under their clothing (Tr. at 38, 40). Winfrey then took Defendant Tingling to a small interview room where she searched Defendant Tingling (Tr. at 40). She found one packet in the front stomach area of Tingling's girdle and found another packet concealed inside the leg of the girdle (Tr. at 38–39). The two packets each contained a quantity of white powder which field tested positive for cocaine, weighed 533 grams (Tr. at 39). Winfrey handed the two packets to Starbuck, who in turn asked Defendant Drummond whether she had cocaine on her person, and Defendant Drummond said yes (Tr. at 40). Defendant Drummond made no further statements to anyone during the course of her arrest (Tr. at 40–41);

20. Winfrey found two similar packages of white powder concealed on Defendant Drummond in the same locations as on Defendant Tingling and found a third smaller package concealed in Defendant Drummond's brassiere (Tr. at 39). The smaller package was different in that it contained a beige, rocky substance which field tested positive for cocaine, a sub-stance more commonly called "crack" (Tr. at 39). The three packages weighed 539 grams (Tr. at 40);

21. Detective Stark interviewed Defendant Tingling and reported to Starbuck that she had admitted possessing cocaine and that she had been given the cocaine by unknown persons in Miami to transport it to Kansas City, where unknown persons would pick her up at the airport (Tr. at 41); and

22. No citations were issued to the defendants, but if they were to be issued they would be for giving false information to a police officer (Tr. at 53). Although the defendants initially were arrested under the charge of giving false information, the charges that actually were filed were related to the cocaine found on the defendants' person (Tr. at 56). It is not unusual to file the more serious of two applicable charges and, in this instance, possession of cocaine was a more serious charge than giving false information to a police officer (Tr. at 57). Starbuck still, at any time, could file charges of giving false information to a police officer (Tr. at 57).