**UNITED STATES of America, Appellee,**

**v.**

**Lloyd ARCHER, Appellant.**

**UNITED STATES of America, Appellee,**

**v.**

**Beverly DRUMMOND, Appellant.**

**UNITED STATES of America, Appellee,**

**v.**

**Marva TINGLING, Appellant.**

**Nos. 87–1389, 87–1746 and 87–1754.**

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 9, 1987.

Decided Feb. 24, 1988.

Rehearing Denied March 28, 1988.

Bruce W. Simon, Kansas City, Mo., for appellants.

Peter M. Ossorio, Asst. U.S. Atty., Kansas City, Mo., for appellee.

Before JOHN R. GIBSON, Circuit Judge, HENLEY, Senior Circuit Judge, and FAGG, Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

Lloyd Archer was charged in a one-count indictment with being an illegal alien in possession of a firearm in violation of 18 U.S.C. § 922(g)(5). Marva Tingling and Beverly Drummond were charged in a two-count indictment with conspiracy to distribute and possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 846. Archer moved to suppress evidence, specifically the pistol found in the trunk of the automobile he was driving, and Tingling and Drummond moved to suppress the cocaine found on their persons. Fourth amendment violations were asserted. Two judges of the district court denied the motions to suppress, 656 F.Supp. 635.[1] Preserving their

---

1. Hearings on the motion were held before Chief Magistrate Calvin K. Hamilton, who rec-ommended that Archer's motion to suppress be denied, but that the evidence seized from Drum-

right to appeal the district court's rulings, Archer pleaded guilty to the charge against him and Drummond and Tingling pleaded guilty to the possession charge. We heard the three cases on the same day. We uphold the denial of the motions to suppress and affirm the convictions.

We state the facts as found by the magistrate and adopted by the district court. Detective David Starbuck of the Kansas City Police Department was assigned to investigate narcotics trafficking at the Kansas City International Airport. He was instructed to watch for black females of Jamaican descent arriving from Miami, Florida on evening flights of Eastern Airlines. Informants had told Starbuck's superiors that persons fitting that profile were smuggling cocaine into the Kansas City Airport and that the preferred method of smuggling on this flight was to conceal cocaine on the courier's person.

On December 2, 1986, Starbuck arrived at the airport, accompanied by two other police officers. All three were armed but in plain clothes. At about 10:00 p.m., Starbuck observed a new white Mazda car parked near the entrance to the Eastern Airlines ticket counter. He watched two black men leave the car and check flight arrival times. A few minutes later he noticed that the car had moved directly outside the gate where Starbuck was positioned. Starbuck walked outside and, as he walked by the car, saw the two men slumped down in the front seats so that no one could see them without walking up and looking into the car. Starbuck went back inside the terminal.

One of the men in the Mazda, later identified as Carl Stroud, came inside the terminal and waited a few feet from Starbuck. Although Starbuck could not remember Stroud's name, he recognized him as someone he had had contact with in the past in connection with a drug investigation.

Flight # 222 from Miami arrived at 10:40 p.m., twenty-five minutes late. The first person off the airplane was Tingling, followed by some ten or twelve passengers, then Drummond. The women walked separately and gave no indication that they were traveling together. Starbuck testified that Drummond and Tingling were the only black persons among the arriving passengers.

The women left the terminal, passing by Stroud without acknowledging him. Stroud followed the women as they walked outside to the Mazda, where Archer was standing with the trunk door open. The women began putting their luggage into the trunk. Starbuck approached the car, identified himself as a police officer and asked Drummond if she would speak with him. The other two officers approached the car; it was their intention that no one should leave in the car at that time.

Starbuck told Drummond that he was a police officer investigating narcotics trafficking at the airport and asked Drummond about her identity, citizenship and the general nature of her travel. She handed Starbuck an Eastern Airlines one-way ticket for Flight # 222 from Miami to Kansas City, paid for in cash, in the name of "Betty Reid." Starbuck asked Drummond her name. She first answered "White" and then quickly said "Betty Reid" while pointing to the ticket. Drummond initially claimed to be an American, but when Starbuck mentioned her accent, she admitted she was a citizen of Jamaica. She was unable to produce a passport, visa or immigration papers, and could not say with certainty where such documents were. She claimed to be visiting a friend in Kansas City, and pointed to Archer, but could not identify him by name or state his address or telephone number; she could only say that she knew him as "P.Z." Starbuck asked Drummond for permission to search her luggage and purse. She consented and

---

mond and Tingling be suppressed. As to Archer, the Honorable Howard F. Sachs, United States District Judge for the Western District of Missouri, adopted the magistrate's findings of fact and agreed with the recommendation. As to Drummond and Tingling, the Honorable Jo-

seph E. Stevens, Jr., United States District Judge for the Western District of Missouri, adopted the magistrate's findings of fact but concluded there was probable cause to arrest and that the searches incident to their arrests were proper.

Starbuck suggested they move inside where it was warm. Once inside, Drummond signed a "consent to search" form with the name "Betty Ried," a spelling at variance with the name "Betty Reid" on the airline ticket she had shown earlier. The search turned up only personal effects but Starbuck noticed that the luggage had no identification tags. After telling her that he could check immigration records to see if she had a passport, Drummond gave the name "Beverly Allen" and then, after Starbuck said he could check that name, she told him her name was Beverly Allen Drummond. At that point she became silent, and Starbuck ended the questioning.

Starbuck then went outside to talk with Tingling while one of the other officers remained inside with Drummond. Tingling agreed to talk with Starbuck. She told him she was a Jamaican citizen, but had no identification, passport, visa or immigration papers. Like Drummond, she had a one-way ticket, paid for in cash, from Miami to Kansas City. The ticket was issued in the name of "Sandra Morris." When asked who her traveling companion was, she identified Drummond as Beverly, then quickly corrected herself and said her name was Betty Reid. A search of Tingling's luggage turned up no contraband, but again Starbuck noticed that the luggage contained no identification. After further questioning, Tingling told Starbuck her name was "Jacinth Miles." She explained that she lied about her name because she was in the country illegally on an expired visa.

While Tingling was repacking her suitcase, Stroud and Archer, who had been waiting outside in the car, came inside to get out of the cold. In response to questions by Starbuck, Archer produced a Florida driver's license. He stated he was a Jamaican citizen and had been in the United States since 1981. He claimed his passport and immigration papers were in Miami, but could not definitely answer why the documents were there. He showed Starbuck a piece of paper indicating that the Mazda had been purchased the day before by Hugh Anthony Gardner with a $7000 down payment. He said he was staying with Gardner and was using the car to pick up the two women on the instruction of someone he called John, whose true name he thought to be Mike Campbell. He stated he had just left a large house on the corner of Belfontaine and Perry, which Starbuck recognized from a prior investigation as one inhabited by Jamaican nationals involved with cocaine distribution.

After an unsuccessful attempt to interview Stroud, Starbuck asked Archer for permission to search the car. He told Archer that he need not consent. Archer consented but refused to sign a written consent form, then orally agreed again to permit the search. Starbuck found a nine-millimeter semiautomatic Glock handgun underneath the front seat. The gun was loaded with a clip of seventeen rounds, and was lying next to another clip of seventeen rounds. The gun was made mostly of plastic, which makes it difficult to detect in airport x-ray machines. Archer and Stroud were then arrested for carrying a concealed weapon. Subsequent questioning led the police to conclude that Archer was an illegal alien; this conclusion is not at issue in this appeal.

After arresting Archer and Stroud, Starbuck arrested Tingling and Drummond inside the building, telling them they were being arrested for giving false information to a police officer and that he planned to contact the Immigration and Naturalization Service. Following the arrests, Drummond and Tingling were taken to the police station. There, Starbuck asked a female officer to search the women before they entered the detention area. Packages of cocaine, totaling over one-half of a kilogram, were found concealed in the undergarments of both women.

On appeal, Archer contends that a seizure within the meaning of the fourth amendment occurred when Detective Starbuck initially confronted him outside the terminal building while he was helping put luggage in the car. He maintains that since the officers lacked probable cause to arrest him at that time, or even reasonable suspicion to detain him, the detention violated the fourth amendment, and therefore

all evidence and statements subsequently elicited must be suppressed as products of the illegal seizure. Drummond and Tingling raise a similiar contention, namely that Starbuck lacked probable cause to arrest them and the cocaine seized from them should be suppressed as a product of the illegal arrest. Finally, Archer argues that he did not validly consent to the search of the car.

## I.

As this court noted in *United States v. Wallraff*, 705 F.2d 980, 988 (8th Cir.1983), Supreme Court cases have placed police-citizen encounters into three categories. First, there are communications between officers and citizens that are consensual and involve no coercion or restraint of liberty. Such encounters are outside the scope of the fourth amendment. Second, there are the so-called *Terry*-type investigative stops. These are brief, minimally intrusive seizures which are considered significant enough to invoke fourth amendment safeguards and thus must be supported by a reasonable suspicion of criminal activity. Third, there are highly intrusive, full-scale arrests, which must be based upon probable cause.

Our initial inquiry is to determine the nature of the encounter between the officers and Archer. Specifically, we must determine whether Archer was seized, and if so, at what point; and if Archer was seized, whether there was sufficient objective justification to support the seizure. Our inquiry is limited to those events before the search of the car, for it is clear that once the car was searched, and the weapon found, there was probable cause to arrest Archer.

Archer argues that when three officers confronted him outside the terminal building, identified themselves as police officers, stated their purpose with the intent that he not be allowed to leave, there was a seizure requiring objective justification. The district court, however, concluded that this initial contact fell into the category of a consensual encounter implicating no fourth amendment interest.

In this circuit, we apply the clearly erroneous standard to review the district court's determinations, made in the context of a motion to suppress, as to whether a fourth amendment seizure occurred and to whether the seizure was supported by reasonable suspicion. *See United States v. Poitier*, 818 F.2d 679, 682 (8th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 700, 98 L.Ed.2d 651 (1988); *Wallraff,* 705 F.2d at 987. Under this standard, the district court's decision must be affirmed unless it lacks "substantial evidence to support it, it evolves from an erroneous view of the applicable law, or upon considering the entire record, we are left with the definite and firm conviction a mistake has been made." *United States v. Ross,* 713 F.2d 389, 392 (8th Cir.1983).

A person has been " 'seized' within the meaning of the fourth amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *I.N.S. v. Delgado,* 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984) (quoting *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980)). "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877; *United States v. Clark,* 743 F.2d 1255, 1258–59 (8th Cir.1984). Police questioning, by itself, is unlikely to be considered a seizure for fourth amendment purposes. *See Delgado,* 466 U.S. at 216, 104 S.Ct. at 1762–63.

The district court did not err in its conclusion that no seizure occurred until the weapon was discovered in the car. We are guided by the case of *Florida v. Rodriguez,* 469 U.S. 1, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984), in which a police officer stationed at the Miami airport noticed three men behaving furtively. The officer faced

one of the men, showed him his badge and asked if they might talk. The man agreed, and the officer suggested that they move approximately 15 feet, near where the other two men were standing. They remained in the public area of the airport. The officer then asked for identification and an airline ticket. The Supreme Court noted, "[t]he initial contact between the officers and respondent, where they simply asked if he would step aside and talk with them, was clearly the sort of consensual encounter that implicates no fourth amendment interest." *Id.* at 5–6, 105 S.Ct. at 311 (citations omitted).

▬▬ In this case, Archer came into the terminal on his own to get out of the cold. There, Starbuck approached him, asked him his name and requested identification. Archer answered the questions freely and voluntarily. There was no evidence that Detective Starbuck or the other two officers used force, threats of force, or other coercive means to obtain Archer's cooperation. None of the officers were in uniform and they were not openly displaying their weapons. Archer was neither physically blocked nor told he could not leave. Whether or not a seizure for fourth amendment purposes occurred is measured under an objective standard, and thus in the present circumstances, the officers' unexpressed intent to detain Archer had he attempted to drive away in the car is of little consequence. *Mendenhall,* 446 U.S. at

554, n. 6, 100 S.Ct. at 1877 n. 6; *United States v. Ceballos,* 812 F.2d 42, 47 n. 2 (2d Cir.1987); *accord United States v. Danielson,* 728 F.2d 1143, 1146 (8th Cir.), *cert. denied,* 469 U.S. 919, 105 S.Ct. 300, 83 L.Ed.2d 235 (1984) (officer's intentions at the time of the stop are irrelevant for purposes of determining whether stop of an automobile rose to the level of an arrest). In the circumstances of this case, we cannot conclude that a reasonable person in Archer's position would have believed that he was not free to leave before the discovery of the weapon in the car. *See Poitier,* 818 F.2d at 683. Because the initial contact was a permissible encounter and the conversation and search that followed was consensual, Detective Starbuck's actions before he arrested Archer for carrying a concealed weapon present no fourth amendment concerns.[2] *See Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1323–24, 75 L.Ed.2d 229 (1983) (plurality); *United States v. Miller,* 835 F.2d 187, 189 (8th Cir.1987); *United States v. Pantazis,* 816 F.2d 361, 363 (8th Cir.1987).

Having determined that the initial confrontation between Archer and the police officers implicated no fourth amendment interests, we now turn to the question of whether Archer validly consented to the search of the car.

▬▬ The test in reviewing a consensual search is whether, in the totality of cir-

---

**2.** We are satisfied that even if the consenual encounter escalated into a seizure invoking the fourth amendment, the confrontation was supported by a reasonable and articulable suspicion of criminal activity. *See Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Wallraff,* 705 F.2d at 988. In considering whether sufficient reasonable suspicion existed to justify a seizure, we will evaluate the circumstances known to Starbuck at the earliest point at which a seizure could be said to have occurred, that is, when Starbuck approached Archer in the airport terminal. Prior to approaching the car, Starbuck observed Archer and Stroud waiting for the arrival of a flight known to be popular with drug traffickers. He recognized Stroud from a prior drug investigation. He saw Archer and Stroud slumped in a car so no one could see them. Starbuck knew that black women of Jamaican origin might be transporting drugs into the Kan-

sas City area and he observed two black women get off the airplane. The women acted as though they were not traveling together or being met at the airport by Stroud. They carried little luggage and proceeded to the Archer car. Starbuck's conversation with the women disclosed that they were not only Jamaican but that they lied about their names and citizenship. Neither woman carried immigration papers and Drummond could not even identify by name her friend "she came to Kansas City to visit." We conclude that this information was sufficient to give Detective Starbuck, who had ten years of police experience, reasonable articulable suspicion to conduct an investigatory, *Terry*-type seizure. *Poitier,* 818 F.2d at 679; *United States v. Jones,* 759 F.2d 633, 643 (8th Cir.), *cert. denied,* 474 U.S. 837, 106 S.Ct. 113, 88 L.Ed.2d 92 (1985); *United States v. Ilazi,* 730 F.2d 1120 (8th Cir.1984). *Cf. Reid,* 448 U.S. at 440–41, 100 S.Ct. at 2753–54.

cumstances, the consent is given voluntarily and without coercion. *United States v. Dennis*, 625 F.2d 782, 793 (8th Cir.1980); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Because the issue of consent is usually a factual one, a district court's finding on voluntariness must be accepted on appeal unless clearly erroneous. *United States v. Turpin*, 707 F.2d 332, 334 (8th Cir.1983).

█ Archer argues that his consent to the search of the car was not voluntarily given, and therefore the evidence obtained must be suppressed. To support this contention, Archer points to the fact that he refused to sign a form giving consent to the search of his car. The district court, adopting the magistrate's findings, concluded that Archer's consent to the search of the car was valid. The court noted that Archer's refusal to sign the written consent form was concurrent with Archer's verbal consent and reasoned that such a response was not a retraction, although it was perhaps illogical. This factual finding is well supported by the record and thus is not clearly erroneous. Starbuck told Archer that he was a police officer investigating narcotics trafficking. He asked Archer if he could search the car and told him he would be looking for narcotics, weapons, currency and paraphernalia. Archer initially consented, then when presented with a "consent to search" form stated that Starbuck "could search the car but he did not want to sign the form." We cannot say that Archer's refusal to sign a written consent form vitiates his verbal consent. *Cf., e.g., Connecticut v. Barrett*, — U.S. —, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987) (suspect's fifth amendment rights not infringed by admission of his oral confession after he has agreed to talk about the crime, but has refused to give a written statement without his lawyer present). *See also United*

*States v. Rohrbach*, 813 F.2d 142, 145 n. 2 (8th Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 2490, 96 L.Ed.2d 381 (1987). In absence of evidence that Archer's consent was involuntary or coerced, Archer's consent to the search of the car was valid. *Schneckloth*, 412 U.S. at 222, 93 S.Ct. at 2045. The district court properly denied Archer's motion to suppress.

## II.

Drummond and Tingling contend that they were arrested without probable cause and that the narcotics found on their persons during a search incident to their arrests should be suppressed as products of the illegal arrests. They maintain that even if the facts at one point gave rise to a reasonable articulable suspicion permitting an investigatory, *Terry*-type seizure, that suspicion was dispelled once Starbuck searched their luggage and discovered no contraband. The district court concluded that Starbuck had probable cause to arrest Drummond and Tingling reasoning that the totality of the facts and circumstances within Starbuck's knowledge were sufficient to justify a prudent person in believing that the appellants were violating narcotics laws.[3]

█ In reviewing the validity of the arrest, we are guided by certain well-established principles. Probable cause exists where the facts and circumstances within the arresting officers' knowledge are sufficient to warrant a prudent person in believing that the suspect had committed or was committing an offense. *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225–26, 13 L.Ed.2d 142 (1964). The determination of whether probable cause exists must not rest on isolated facts; rather it depends on the cumulative effect of the facts in the totality of the circumstances. *United States v. Bubis*, 744 F.2d 61, 64 (8th Cir.1984) (citing

---

**3.** The district court adopted the finding of the Chief Magistrate that neither appellant violated state laws or local ordinances dealing with making false reports to public authorities and that their arrests cannot be supported by reference to these provisions. Probable cause is measured under an objective standard; thus Detective Starbuck's belief that he was arresting the two women for violations of these provisions is irrelevant. *See United States v. Lester*, 647 F.2d 869, 873 (8th Cir.1981), and *Klinger v. United States*, 409 F.2d 299, 304–06 (8th Cir.), *cert. denied*, 396 U.S. 859, 90 S.Ct. 127, 24 L.Ed.2d 110 (1969). *See also United States v. Hawkins*, 811 F.2d 210, 213–15 (3d Cir.), *cert. denied*, — U.S. —, 108 S.Ct. 110, 98 L.Ed.2d 69 (1987).

*United States v. McGlynn*, 671 F.2d 1140, 1143 (8th Cir.1982)). In reviewing a district court's factual finding and determination as to the existence of circumstances justifying a warrantless arrest, we apply the clearly erroneous standard. *Bubis*, 744 F.2d at 64.

After carefully reviewing the record, we conclude that the district court did not err in finding probable cause to arrest Drummond and Tingling. Before the flight from Miami arrived, Starbuck observed two men waiting in a car outside the gate where a late night Eastern Airlines flight from Miami was scheduled to arrive. At one point, the men were slumped down in the car so no one would see them. Starbuck recognized one of the men as someone he had had contact with before in connection with a drug investigation.

Starbuck knew that late-night Eastern Airlines flights into Kansas City from Miami had become popular with cocaine traffickers. He knew that the preferred method of couriers smuggling on this flight was to conceal the cocaine on the person, and that the carriers were often black women of Jamaican descent.

As Starbuck watched the arriving passengers enter the terminal building, he noticed only two black women, Drummond and Tingling. Stroud did not acknowledge that he was meeting the women at the airport nor did Drummond and Tingling acknowledge that they were traveling together. Yet all three walked to the same car and Drummond and Tingling began putting their luggage into the car.

While talking with Drummond, Starbuck learned that she was a Jamaican citizen traveling to Kansas City on a one-way ticket, issued under a false name and paid for in cash. She changed her name four different times and lied about her citizenship. She claimed to be visiting a friend in Kansas City but could not name him, state his address or telephone number. Drummond's luggage bore no identification tags. Likewise, Starbuck learned that Tingling was also a Jamaican national traveling on a one-way ticket paid for in cash and that none of her luggage bore identification.

After the search of Drummond and Tingling's luggage revealed no contraband, Starbuck talked with Archer. He learned that Archer was a Jamaican national who had just left a house which Starbuck recognized as being the subject of a drug investigation involving Jamaican nationals. He recognized Archer's companion in the car, Stroud, from a prior drug investigation. The search of the car revealed a plastic semi-automatic loaded handgun. While the search of Drummond and Tingling's luggage revealed no contraband and may have cast some doubt on Starbuck's initial suspicions, we are satisfied that subsequent events, combined with what Starbuck had already learned, renewed and indeed escalated those suspicions into probable cause. We hold that the district court's determination that Drummond's and Tingling's arrests were supported by probable cause is not clearly erroneous. Accordingly, the district court properly denied the motions to suppress. *See United States v. Phillips*, 607 F.2d 808, 809–10 (8th Cir.1979). We affirm the convictions.