UNITED STATES of America,
Appellant,

v.

Tunya Reginera POITIER, Appellee.

No. 86–1616.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 13, 1987.

Decided May 13, 1987.

Rehearing and Rehearing En Banc
Denied July 30, 1987.

Robert J. Govar, Asst. U.S. Atty., Little Rock, Ark., for appellant.

Howard Sohn, Miami, Fla., for appellee.

Before BOWMAN and MAGILL, Circuit Judges, and HARPER, Senior District Judge.[*]

MAGILL, Circuit Judge.

In this case we examine whether the district court correctly ordered suppression of evidence obtained through a search at an airport. We conclude that the district court erred in suppressing the evidence, and accordingly we reverse.

## I. FACTS.

At about 11:30 a.m. on December 19, 1985, Special Agent Paul Markonni of the Drug Enforcement Administration (DEA) was at Gate A–20 of the Atlanta Airport in Atlanta, Georgia, watching the arrival of Delta Airlines Flight No. 817 from Miami, Florida. He saw the appellee, Tunya Reginera Poitier, leave the plane, approach a Delta agent, and request information as to her connecting flight to Little Rock, Arkansas. Following the Delta agent's direction, Poitier headed for Gate A–7. Markonni noted that Poitier was "very well dressed" and carrying a coat over her arm, but he noticed nothing unusual or suspicious about her.

A few seconds later, however, Markonni saw a man later identified as Larry Gene Harvey walk past and quickly follow Poitier, tracking her route, down the concourse toward Gate A–7. Another DEA agent told Markonni that Harvey had also left Flight No. 817. Harvey was casually dressed, wearing blue jeans and a black leather jacket with a distinctive fish scale design on the back. Harvey caught up to Poitier and they walked side by side, maintaining about five feet between them, yet they appeared to be speaking to each other. Markonni suspected that they might be trying to conceal the fact that they were traveling together. He had in the past seen drug couriers do this to avoid the possibili-

ty of both being arrested should an arrest take place.

Markonni followed Harvey and Poitier to Gate A–7, saw them get together, give their tickets to the Delta agent, and get on Delta Flight No. 705 to Little Rock, Arkansas. Markonni then retrieved the two tickets from the Delta agent, and saw that the names on the tickets were Tunya Poitier and Al Harvey and that the tickets were sequentially numbered, were both purchased for cash, and had an identical travel schedule, Miami to Atlanta and Atlanta to Little Rock. Markonni got a copy of the passenger name record for Poitier and Harvey, reconfirmed that they had identical itineraries, and also noted that they had used the same telephone number in Miami as a reference number, but that they had made their reservations separately and were seated in separate sections of the plane for both legs of the flight. He also found that their separate reservations had been made within the same minute. Markonni then called the Miami telephone number listed on the reservation records, and the woman answering told him that she knew Poitier, but not Al Harvey, and that Poitier would be returning the following day. Markonni then telephoned Special Agent Gary Worden of the DEA office in Little Rock, Arkansas, and told him all the information he had gained as to Poitier and Harvey and gave physical descriptions of the two.

Based on this information, DEA agents in Little Rock decided to establish a surveillance team at the Little Rock airport to watch Flight No. 705 from Atlanta. During a debriefing session before the plane landed, the team was told to let Harvey and Poitier go on their way if they did not want to cooperate with the officers or answer questions. After 4:00 p.m. that afternoon, the surveillance team saw two people matching the descriptions of Harvey and Poitier leaving Flight No. 705. Harvey left the plane before Poitier and walked at first

---

[*] The HON. ROY W. HARPER, United States Senior District Judge for the Eastern and Western Districts of Missouri, sitting by designation.

approximately 15 to 20 feet ahead of her, but she eventually caught up with him and they spoke, although walking about four feet apart. Little Rock narcotics detective David Hudson and DEA Special Agent Edward DiScenza then approached Poitier from both sides and DiScenza produced DEA credentials, while another five or six federal and local agents stopped Harvey in the same area. DiScenza told Poitier that he wanted to ask her some questions, she agreed, and he suggested that they move out of the main concourse towards the lesser-populated waiting area of Gate 1 of the terminal. DiScenza asked Poitier her name and for identification, which she provided. He asked her where she was from, and she replied that she was from Miami, Florida. When asked what she was doing in Little Rock, Poitier stated that she was there to party for a few days with her boyfriend. She identified Harvey as her boyfriend and said she had known him for about six months.

DiScenza walked over to Harvey and asked him if he knew Poitier. Harvey said that he barely knew her and had just met her in Miami. The inconsistent information made DiScenza suspicious and he told Poitier that he suspected her of carrying drugs from Florida. He gave her oral *Miranda* warnings, and she told him that she understood them. Then Hudson asked her directly if she was carrying drugs and she answered that she was. When asked what type of drugs she was carrying, she answered cocaine. She was then placed under arrest and searched, and about one kilogram of cocaine was found.[1]

## II. DISTRICT COURT PROCEEDINGS.

After being indicted by a grand jury on charges of conspiracy to distribute cocaine and possession with intent to distribute cocaine, Poitier moved to suppress the cocaine seized from her at the airport, as well as statements she made when detained.

The district court examined whether the detention was supported by a reasonable and articulable suspicion that she had committed or was currently committing a crime. The court stated that the initial contact by the officers with Poitier was intended to be a limited investigative stop, also known as a *Terry*-type stop, which requires reasonable suspicion by the officer. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). To validate such a stop, the officer must be able to point to specific and articulable facts, which taken together with rational inferences from these facts, reasonably warrant the intrusion. *United States v. Borys*, 766 F.2d 304, 308 (7th Cir.1985), *cert. denied*, — U.S. ——, 106 S.Ct. 852, 88 L.Ed.2d 893 (1986).

The district court concluded that there was not sufficient reasonable suspicion that Poitier had committed or was about to commit a crime to justify the intrusion and seizure in this case. The court further found that when the officers showed their identification and gestured to Poitier to move to the waiting area, a reasonable person in Poitier's position would not have felt free to stop the questioning and leave. The court characterized the intended *Terry*-stop as a *de facto* arrest from its inception. The district court thus granted Poitier's motion to suppress.

## III. DISCUSSION.

Our starting point is to determine the nature of the encounter between the agents and Poitier. More specifically, we must determine whether Poitier was seized, and if so, at what point; and, if Poitier was seized, was there objective justification sufficient to create reasonable suspicion that she was engaging in criminal activity.

█ As this court noted in *United States v. Wallraff*, 705 F.2d 980, 988 (8th Cir.

---

**1.** Poitier's testimony presented a very different series of events. According to her, Agents Hudson and DiScenza stopped her by each grabbing one of her arms. The agents asked her name and then, without releasing her arms, they steered her over to the waiting area, where they told her to sit down and stay right there, because they were going to ask her some more questions. While seated, she was asked for identification, which she produced from her purse. DiScenza then took her purse and began going through it. She testified that her identification and purse were not returned to her until later, at the police station. The district court in its oral ruling, however, expressly accepted the agents' version of the facts.

1983), Supreme Court jurisprudence has placed police-citizen encounters into three tiers or categories: First, there are communications between officers and citizens that are consensual and involve no coercion or restraint of liberty. Such encounters are outside the scope of the Fourth Amendment. Second, there are the so-called *Terry*-type stops. These are brief, minimally intrusive seizures but which are considered significant enough to invoke Fourth Amendment safeguards and thus must be supported by a reasonable suspicion of criminal activity. Third, there are highly intrusive, full-scale arrests, which must be based on probable cause.

Reviewing the record, we are unable to agree with the district court that the agents' initial contact with Poitier fell into the category of an investigative, *Terry*-type stop. We accept the district court's findings of fact and cannot say that they are clearly erroneous. The only issue is the application of the law to those facts. The applicable standard of review in this area is subject to some confusion, namely, whether a trial court's conclusion as to Fourth Amendment custody is a question of fact or a conclusion of law. *See United States v. Ceballos*, 812 F.2d 42, 47 n. 1 (2d Cir.1987). This circuit, however, has settled upon the "clearly erroneous" standard in reviewing the district court's determinations, made in the context of a motion to suppress, as to the existence of circumstances justifying a warrantless arrest. *Wallraff*, 705 F.2d at 987.

■ We conclude, under this standard of review, that the district court misapplied the pertinent case law to the facts at issue. The district court found that "when the Little Rock officers displayed their identification and 'gestered' [sic] to defendant to move to a seated area located to the side of the concourse * * * a reasonable person in this posture would not have felt free to terminate the interrogation conducted by the officer and depart from the airport." Our review of the cases convinces us, however, that more is required to turn consensual questioning into a *Terry*-type investigative stop than the display of badges, the request for information, and the suggestion that the parties move to a nearby area out of the flow of traffic.

We are guided in this regard by the similar case of *Florida v. Rodriguez*, 469 U.S. 1, 3–4, 105 S.Ct. 308, 309–10, 83 L.Ed.2d 165 (1984). In *Rodriguez* a police officer stationed at the Miami airport noticed three men behaving furtively. The officer then faced one of the men, showed his badge, and asked him if they might talk. The man agreed, and the officer suggested that they move approximately 15 feet to where the other two men were standing. They remained in the public area of the airport. The officer then asked for identification and an airline ticket, which one of the three men produced. When asked their names, one of the men gave a name different from the one on the ticket. At this point, another officer told the suspects that they were narcotics officers and asked one of the suspects for consent to search his luggage. The Supreme Court noted:

> The initial contact between the officers and respondent, where they simply asked if he would step aside and talk with them, was clearly the sort of consensual encounter that implicates no Fourth Amendment interest. *United States v. Mendenhall*, [446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) ] (opinion of Stewart, J.); *Florida v. Royer*, [460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) ] (opinion of WHITE, J.). Assuming, without deciding, that after respondent agreed to talk with the police, moved over to where his cohorts and the other detective were standing, and ultimately granted permission to search his baggage, there was a "seizure" for purposes of the Fourth Amendment, we hold that any such seizure was justified by "articulable suspicion."

*Rodriguez*, 469 U.S. at 5–6, 105 S.Ct. at 310–11. *See also United States v. Morgan*, 725 F.2d 56, 57 (7th Cir.1984); *United States v. Ehlebracht*, 693 F.2d 333, 338 (5th Cir.1982); *United States v. Black*, 675 F.2d 129, 132 (7th Cir.1982), *cert. denied*, 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d

945 (1983); *United States v. Deggendorf,* 626 F.2d 47, 52–53 (8th Cir.), *cert. denied,* 449 U.S. 986, 101 S.Ct. 405, 66 L.Ed.2d 249 (1980).

We note further that the officers in this case were not in uniform, were not openly displaying weapons, and according to their testimony did not physically touch Poitier. "We adhere to the view that a person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall,* 446 U.S. 544, 553, 100 S.Ct. 1870, 1876, 64 L.Ed.2d 497 (1980). We conclude that there was no such restraint in this case, at least not until Harvey and Poitier gave the agents inconsistent information.

We next examine whether the agents' telling Poitier that they suspected her of carrying drugs, followed by their giving her *Miranda* warnings and asking her whether she was carrying drugs, elevated the encounter to a *Terry*-type stop and if so, whether it was permissible under the Fourth Amendment.

█ Although the encounter between Poitier and the agents began as a consensual one, we conclude that when the agents stated that they suspected Poitier of carrying drugs and read her *Miranda* rights, at that point a reasonable person would not have felt free to leave. The accusation, coupled with the *Miranda* warnings, created a sufficient show of authority to effectively restrain Poitier's freedom of movement. *Mendenhall,* 446 U.S. at 553–54, 100 S.Ct. at 1876–77. We thus turn to an examination of the legality of the *Terry*-type stop.

█ In order to pass Fourth Amendment scrutiny, a *Terry*-type stop must be based on a reasonable articulable suspicion of criminal activity, rather than mere conjecture or hunches. In deciding whether the requisite degree of suspicion exists, we view the agents' observations as a whole, rather than as discrete and disconnected occurrences. Further, these observations must be viewed through the eyes of persons who, like the agents in this case, are trained to cull significance from behavior that would appear innocent to the untrained observer. *See United States v. Wallraff,* 705 F.2d 980, 988 (8th Cir.1983). Until Poitier and Harvey were questioned by the agents, the only basis the agents had for suspecting them of carrying drugs was that they showed certain characteristics of the "drug courier profile." [2] Under *Reid v. Georgia,* 448 U.S. 438, 440–41, 100 S.Ct. 2752, 2753–54, 65 L.Ed.2d 890 (1980), the mere fact that a suspect fits the "drug courier profile" may not be the basis for reasonable suspicion of criminal activity. The record reflects, however, that upon being questioned as to their relationship, Poitier's answers conflicted sharply with Harvey's. A suspect's displaying characteristics of the drug courier profile, when coupled with untruthful answers given to police questioning, together may constitute sufficient basis for an investigative, *Terry*-type seizure. *See Borys,* 766 F.2d at 311–12. Thus we conclude that the investigative, *Terry*-type stop properly began after the discrepancies were found in the stories.

**2.** The "drug courier profile" is an informal compilation of characteristics often displayed by those trafficking in drugs. It is noteworthy that Special Agent Markonni, who initially noticed Poitier and Harvey in this case, developed the drug courier profile and is known as an extraordinarily effective DEA agent. *See United States v. Ehlebracht,* 693 F.2d 333, 335 n. 3 (5th Cir. 1982). In this case, the agents' attention was attracted by the following facts considered to be within the profile: Harvey and Poitier departed from Miami, a drug center, they bought airline tickets in cash, and they apparently tried to disassociate themselves from each other, both during the flights and in the Atlanta and Little Rock airports.

We reject Poitier's contention that her actions leading to the contact with the agents could also be interpreted as manifestations of wholly innocent behavior. For example, she points out that the separate seating arrangements on the planes were because Harvey smoked and she didn't, and that they walked down the concourse separately because each was hurrying to catch the next flight. As other courts have pointed out, "[i]t must be rare indeed that an officer observes behavior consistent *only* with guilt and incapable of innocent interpretation." *United States v. Rickus,* 737 F.2d 360, 365 (3d Cir.1984), quoting *United States v. Price,* 599 F.2d 494, 502 (2d Cir.1979).

Because Poitier's detention was supported by reasonable suspicion, we must now examine whether it was properly limited in scope and duration. The purpose of the stop was to verify or dispel the agents' suspicion that Poitier was trafficking in illegal drugs, a legitimate and substantial government interest. From the time the consensual encounter ripened into a *Terry*-type investigative detention (*i.e.*, when the agents received inconsistent information) to the time Poitier was placed under arrest, no more than a minute passed. During this brief time Poitier was given *Miranda* warnings, was told that she was suspected of carrying drugs, admitted to carrying drugs, and identified them as cocaine. The agents did not take Poitier anywhere during this time, nor did they ask more than two questions—whether she was carrying drugs, and of what type. Thus the *Terry*-type stop in this case was exceedingly limited in scope and duration.

Regarding the propriety of the actual arrest, we need only say that in light of the foregoing, there was sufficient probable cause to arrest and search Poitier when she admitted that she was carrying cocaine.

Accordingly, we reverse the judgment of the district court ordering suppression of the evidence in this case.