**UNITED STATES of America, Appellee,**

v.

**Lee Andrew CAMPBELL a/k/a John Evans, Appellant.**

No. 87–1192.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 12, 1987.

Decided March 30, 1988.

Rehearing and Rehearing En Banc Denied May 17, 1988.

J. Justin Meehan, St. Louis, Mo., for appellant.

Debra Herzog, Asst. U.S. Atty., St. Louis, Mo., for appellee.

Before JOHN R. GIBSON, FAGG and WOLLMAN, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

Lee Andrew Campbell appeals his conviction of possessing cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (1982). The sole issue on appeal is whether Campbell was unlawfully seized in violation of the fourth amendment before he consented to a search of his coat which revealed cocaine in its pocket. The district court,[1] adopting the recommendations of the magistrate, concluded that Campbell was lawfully seized based on reasonable and articulable suspicion of criminal activity under the principles of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and that he voluntarily consented to the search of his coat. We affirm the conviction.

Campbell arrived in St. Louis on TWA Flight # 72 from Los Angeles at 5:30 a.m. on July 24, 1986, wearing a heavy winter coat and carrying only a shoulder bag. Campbell walked very quickly as he entered the concourse. DEA agents had watched the arrival of this flight once a week since June. They were particularly interested in this flight because Los Angeles is considered a source of drugs, the flight left Los Angeles after DEA agents there went off duty, and arrived in St. Louis at a time when its airport was uncrowded. As Campbell left the gate, he looked behind him several times, did not check the arrival or departure boards or pick up baggage, and went directly to the outside area for departing passengers. DEA agents Benjamin Scott and Linda Harold followed him through the terminal and outside.

Agent Scott, who was dressed in plain clothes, identified himself to Campbell as a DEA agent and asked if he would talk with him. Campbell stopped walking and Scott asked to see his airline ticket. Campbell produced a one-way ticket from Los Angeles to St. Louis purchased with cash. Scott then asked for identification, and Campbell provided a Missouri identification card in the name of John Evans, which matched the airline ticket name of J. Evans. During the conversation Scott noticed that Campbell's voice sounded nervous and that his hands trembled when he handed him the airline ticket. Scott examined the airline ticket and identification card and according to the findings of the district court, he did not return them to Campbell.[2] Scott

---

1. The Honorable John F. Nangle, United States District Judge for the Eastern District of Missouri.

2. We have serious questions about this finding, although the government does not attack it as clearly erroneous. In the hearing before the

magistrate, Agent Scott testified that he asked to see and looked at Campbell's airline ticket and identification. He does not indicate whether he returned the items while he continued to talk with Campbell. Campbell testified that Scott put the tickets and identification card in his

informed Campbell that as a narcotics agent, he was looking for certain things that people do that sometimes indicate that they are transporting narcotics and that Campbell had done several of these things. He asked, and received, permission to search Campbell's carry-on bag, but found only clothing. Campbell still appeared nervous and Scott asked if he "would mind" if he searched his coat pockets. Campbell hesitated several seconds and then told him to "go ahead." He searched the outer pockets and found nothing. However, he could feel through Campbell's coat pocket that there was some sort of package in the inner upper left-hand pocket and he reached inside. As he reached in the pocket Campbell raised his hands as if to block Scott, but their hands did not make contact. Scott asked what the package was and Campbell replied that "it was nothing." Scott removed the package, a plastic bag wrapped in tape and containing a white powder, from the pocket. This entire encounter occurred in a public place at the drop-off point for departing passengers.

Agent Scott told Campbell that he believed the powder was cocaine and that he was taking him to the airport police office. Campbell said that he was "not going anywhere." At that point Agent Harold, who had been standing ten to twenty feet away, unnoticed by Campbell, stepped closer and helped handcuff Campbell. When they reached an interview room the agents searched Campbell and found a second package taped to the small of his back under his shirt. Scott field-tested the substance in the first package and found it to be cocaine. Scott then arrested Campbell and informed him of his *Miranda* rights. The bags contained a total of 237.6 grams of pure cocaine.

■ Campbell moved to suppress the cocaine seized from him at the airport, arguing that the initial contact by Agent Scott was an unlawful seizure which rendered all evidence obtained thereafter inadmissible as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 417–18, 9 L.Ed.2d 441 (1963). Specifically, Campbell maintains that he was stopped solely because he conformed with certain aspects of the drug courier profile[3] and, relying on *Reid v. Georgia*,

pocket and they were not returned to him. After this conflict was called to the attention of the magistrate, the government volunteered to recall Agent Scott; however, it did not do so. Although the magistrate determined that Scott's testimony was more credible than Campbell's on the issue of whether Campbell consented to the search of his coat and luggage, the magistrate made no finding as to whether the ticket and identification were returned by Scott. The magistrate found only that Scott asked to see and looked at the ticket and identification.

In the trial before the district court, Scott and Agent Linda Harold both testified that after examining the ticket and identification Scott returned it to Campbell and it was only after Campbell was formally arrested that these items were confiscated by Agent Scott. Campbell did not testify. The district court recited in its order that it considered the pleadings, the stipulations of the parties and the evidence introduced at trial and further recited that it was "fully advised in the premises." We do not know whether the district court studied the transcript of the hearing before the magistrate. Campbell's testimony in the hearing before the magistrate is the only evidence that would support the district court's finding that Scott did not return the ticket and identification card. Rather than remand this case for a fuller consideration of this issue, we will consider it based

upon the district court's findings in its order. As we will further explain, had the district court determined that Scott returned the ticket and identification, there would be no basis for saying a seizure occurred and the entire incident would have been a consensual one.

3. The "drug courier profile" is an informal compilation of characteristics often displayed by those trafficking in drugs. In this case, the agent's attention was drawn to the following facts considered to be within the profile: Campbell departed from Los Angeles, a "source" city; he used a one-way airline ticket purchased with cash; he arrived early in the morning; and he carried only carry-on luggage. The parties have vigorously argued over whether the "drug courier profile" is sufficient to sustain any seizure of Campbell. Campbell argues that the profile was insufficient to support a seizure; the government essentially argues that this is a profile-plus case. A number of decisions of the Supreme Court and appellate courts have made reference to the profile. We are aware that the profile has value to experienced police officers in determining whether or not further investigation efforts are required. We do not believe, however, that a bright-line rule approving the profile need be drawn. Our review of the propriety of any seizure must be based on a review of the totality

448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam), Campbell argues that a suspect's match to the drug courier profile does not provide an officer with the reasonable suspicion necessary to justify a fourth amendment seizure.

In denying the motion to suppress, the district court determined that the initial encounter was consensual, requiring no objective justification, and that Campbell answered the questions put to him voluntarily. The court then determined that the encounter matured into an investigative, *Terry* -type seizure which did not violate the fourth amendment because it was based on a reasonable and articulable suspicion of criminal activity and was properly limited in scope and duration. The court further found that Campbell consented to the search of his bag and coat and that once Agent Scott found the packet of white powder, probable cause existed to arrest Campbell. After waiving his right to trial by jury, Campbell was convicted and sentenced to six years' imprisonment plus a three year mandatory parole term.

### I.

■ Not every encounter between law enforcement officers and an individual constitutes a seizure within the meaning of the fourth amendment. *INS v. Delgado*, 466 U.S. 210, 215–17, 104 S.Ct. 1758, 1762–63, 80 L.Ed.2d 247 (1984). It is well-settled that "law enforcement officers do not violate the fourth amendment by merely approaching an individual on the street or in another public place by asking him if he is willing to answer some questions [and] by putting questions to him." *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1323–24, 75 L.Ed.2d 229 (1983) (plurality); *United States v. Mendenhall*, 446 U.S. 544, 555, 100 S.Ct. 1870, 1877–78, 64 L.Ed.2d 497 (1980) (opinion of Stewart J.). No objective justification is required for such an encounter because no constitutional interest is implicated. *Mendenhall*, 446 U.S. at 554–55, 100 S.Ct. at 1877–78. However, an initially

consensual encounter can ripen into a seizure requiring reasonable suspicion or probable cause. *Delgado*, 466 U.S. at 215, 104 S.Ct. at 1762. "If an officer, by means of physical force or show of authority, has restrained the liberty of a citizen, we must conclude that a seizure requiring objective justification has occurred." *Delgado*, 466 U.S. at 215, 104 S.Ct. at 1762 (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968)). In determining whether a person has been seized, the inquiry is whether, in view of all the circumstances surrounding the incident, "a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877. Whether reasonable suspicion or probable cause exists to justify a seizure is a mixed question of fact and law. The findings with respect to the historical facts are reviewed under the clearly erroneous standard; the ultimate conclusion, however is subject to *de novo* review. *See United States v. Mendenhall*, 446 U.S. 544, 551–52 n. 5, 100 S.Ct. 1870, 1875–76 n. 5, 64 L.Ed. 2d 497 (1980).

■ The district court did not err in finding that the initial encounter was consensual. The court correctly concluded that Scott did not seize Campbell when he approached him outside the airport, identified himself as a narcotics agent and asked Campbell if he would answer a few questions. *See, e.g., United States v. Poitier*, 818 F.2d 679, 682 (8th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 700, 98 L.Ed. 2d 651 (1988); *United States v. Sadosky*, 732 F.2d 1388, 1391 (8th Cir.), *cert. denied*, 469 U.S. 884, 105 S.Ct. 254, 83 L.Ed.2d 191 (1984). Although there is little doubt that this initial interview came about because of Campbell's conformity with the drug courier profile, Scott used this information only to approach Campbell. *See United States v. Miller*, 835 F.2d 187, 189 (8th Cir.1987); *United States v. Pantazis*, 816 F.2d 361, 363 (8th Cir.1987); *cf. Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752. Scott did not use

---

of the circumstances surrounding the event. The fact that the profile was or was not utilized in the initial conversation and ultimate seizure

is merely one of the factors that must be considered and evaluated.

force or coercion to obtain Campbell's cooperation; Campbell stopped walking and voluntarily produced his airline ticket and identification card in response to Scott's questioning. Because the initial contact was a permissible encounter and the conversation that followed was consensual, Agent Scott's actions, at this point, present no fourth amendment concerns. *Royer*, 460 U.S. at 497, 103 S.Ct. at 1323–24; *Miller*, 835 F.2d at 189; *Poitier*, 818 at 682–83; *Pantazis*, 816 F.2d at 363.

The district court's conclusion that a *Terry*-type investigatory stop and seizure within the meaning of *Terry* occurred can only be based on the district court's finding that Scott retained Campbell's ticket and identification card. An officers' retention of an airline ticket or a driver's license has been treated as a significant factor in determining that a seizure has occurred.[4] Suspects deprived of their ticket or license are effectively deprived of the practical ability to terminate the questioning and leave. *See Royer*, 460 U.S. at 501, 103 S.Ct. at 1326 (seizure occurred when narcotics agents, while retaining Royer's airline ticket and driver's license, asked Royer to accompany them to a police room without indicating in any way that he was free to depart); *United States v. Cordell*, 723 F.2d 1283, 1285 (7th Cir.1983) (consensual questioning ripened into investigative stop when one officer handed airline ticket and driver's license to second officer), *cert. denied*, 465 U.S. 1029, 104 S.Ct. 1291, 79 L.Ed.2d 693 (1984); *Thompson*, 712 F.2d at 1359–61 (consensual questioning ripened into investigative stop when officer retained suspect's driver's license). In this case, we are not convinced the retention of Campbell's ticket and identification card is as significant in determining whether a seizure occurred. The ticket retained by Scott was a used, one-way ticket. Campbell could not use the ticket for further transportation and the district court made no findings as to whether it may have had value to him for any other purposes. The identification was a state-issued identifica-

tion card rather than a driver's license. Thus, as a practical matter, the retention of these documents did not prevent Campbell from ending the questioning and going on his way. Nevertheless, this finding is the support for the district court's conclusion that the consensual encounter ripened into an investigative, *Terry*-type seizure. The government in its brief and at oral argument assumed that such a seizure occurred. Accordingly, based on the district court's conclusion that a seizure occurred, we now consider whether the seizure was supported by a reasonable and articulable suspicion of criminal activity. *Reid v. Georgia*, 448 U.S. at 440, 100 S.Ct. at 2753–54.

The standard of articulable justification required by the fourth amendment for an investigative, *Terry*-type seizure is whether the police officers were aware of "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant[ed] suspicion that a crime [was] being committed." *United States v. Martin*, 706 F.2d 263, 265 (8th Cir.1983); *see also Terry*, 392 U.S. at 20–21, 88 S.Ct. at 1879–80. In assessing whether the requisite degree of suspicion exists, we must determine whether the facts collectively establish reasonable suspicion, not whether each particular fact establishes reasonable suspicion. "[T]he totality of the circumstances—the whole picture—must be taken into account." *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). We may consider any added meaning certain conduct might suggest to experienced officers trained in the arts of observation and crime detection and acquainted with operating modes of criminals. *See United States v. Wallraff*, 705 F.2d 980, 988 (8th Cir. 1983). It is not necessary that the behavior on which reasonable suspicion is grounded be susceptible only to an interpretation of guilt, *id;* however, the officers must be acting on facts directly relating to the suspect or the suspect's conduct and not just

---

4. *See, e.g., Royer*, 460 U.S. at 501, 103 S.Ct. at 1326; *United States v. Thompson*, 712 F.2d 1356,

1359–61 (11th Cir.1983) (citations omitted).

on a "hunch" or on circumstances which "describe a very broad category of predominantly innocent travelers." *Reid v. Georgia*, 448 U.S. at 440–41, 100 S.Ct. at 2754; *United States v. Sokolow*, 831 F.2d 1413 (9th Cir.1987).

In light of these principles we evaluate the circumstances known to Agent Scott at the time the seizure occurred: (1) Campbell arrived on a flight from Los Angeles, a known "source" city for drugs; (2) Campbell arrived on a flight which agents had been watching because it left Los Angeles after DEA agents there went off duty; (3) Campbell arrived in St. Louis at a time when the airport was uncrowded; (4) Campbell walked very quickly and did not check the arrival or departure boards; (5) Campbell looked behind him several times while walking; (6) Campbell did not pick up any checked luggage and carried no luggage other than a carry-on bag; (7) Campbell wore a winter coat in late July;[5] (8) Campbell used a one-way ticket paid for in cash; and (9) Campbell was very nervous while talking with the agent and he remained nervous even after handing Scott his ticket and identification, which revealed no apparent discrepancies.

█ The facts outlined above, unlike those in *Reid v. Georgia*, when viewed collectively, are sufficient to have aroused a reasonable, articulable suspicion that criminal activity was afoot. There, the stop was held unlawful because the law enforcement officer stopped Reid merely on a "hunch" that Reid and another man were trying to conceal the fact that they were traveling together. 448 U.S. at 441, 100 S.Ct. at 2754. Reid arrived in Atlanta on a commercial flight from Fort Lauderdale. A DEA agent noticed Reid, who carried only a shoulder bag, and a second man who walked behind Reid and who also carried only a shoulder bag. The agent observed that as they walked, Reid occasionally looked backward in the direction of the second man. The second man caught up with Reid in the main lobby of the terminal and spoke briefly with Reid. The two men left the building together. The agent then stopped them. *Id.* at 439, 100 S.Ct. at 2753. The only evidence particularly related to Reid's conduct supporting the agent's decision to make the stop was the fact that Reid occasionally looked over his shoulder at another man who was walking behind him. Under these circumstances the court held that the agents' reasonable suspicion could not rest solely on factors that, although in conformity with the drug courier profile, "describe a very large category of presumably innocent travelers." *Id.* at 441, 100 S.Ct. at 2754. As this and other circuits have recognized, however, *Reid* does not preclude all reliance on courier profile characteristics; it simply indicates that the most general of those characteristics cannot be the sole support for a seizure without more particularized evidence of suspicious activity.[6] *See, e.g., Poitier,* 818 F.2d at 683; *Pantazis* 816 F.2d at 363–64; *Sadosky,* 732 F.2d at 1393–94; *see also United States v. Erwin,* 803 F.2d 1505, 1511 (9th Cir.1986); *United States v. Berry,* 670 F.2d 583, 599–601 (5th Cir. Unit B 1982) (en banc); *United States v. Corbin,* 662 F.2d 1066, 1069 (4th Cir.1981).

Unlike the facts in *Reid,* the facts Agent Scott relied on do not "describe a very large category of presumably innocent travelers * * *." *Reid,* 448 U.S. at 441, 100 S.Ct. at 2754. Instead, there were sufficient facts related directly to Campbell's behavior to lead the agents reasonably to suspect him of commiting a crime.

---

**5.** Agent Scott testified that Campbell was the only arriving passenger wearing a coat; the other arriving passengers were "casually" dressed, "most passengers were wearing short-sleeve shirts."

**6.** The Supreme Court confronted the reasonable suspicion issue more recently in *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). The officers detained the defendant in that case on the basis of the following circum-

stances: (1) Royer carried heavy American Tourister luggage; (2) he dressed casually and was apparently between age 25–35; (3) he appeared nervous and watchful; (4) he paid for a one-way ticket in cash; (5) he wrote an assumed name and destination on his baggage identification tag. *Royer,* 460 U.S. at 493–94, 103 S.Ct. at 1321–22. Eight justices agreed that these circumstances justified an investigatory seizure of Royer. *Id.* at 502, 103 S.Ct. at 1326–27.

Campbell appeared nervous while walking through the airport. He was "moving very quickly," and looked at least three times over his shoulders. He was wearing a winter coat in the middle of the summer. He continued to be nervous while talking with Agent Scott. His hands were visibly trembling and his voice quivered. He remained nervous even after he handed Scott his airline ticket and identification card revealing no apparent discrepancies. Thus, the particularized evidence of Campbell's nervousness and unusual dress was sufficient to permit reference to his profile characteristics—traveling from a drug-source city, arriving early in the morning, carrying only a shoulder bag, using a one-way ticket paid for in cash—generally suggestive of a drug courier. While the case is close, we conclude that together, the two forms of evidence provided Agent Scott with a reasonable, articulable suspicion that Campbell was carrying narcotics. Other circuits have found reasonable suspicion on comparable facts.[7]

■ Having decided that Agent Scott had valid grounds for an investigatory stop, we must further ascertain whether the agents transformed the encounter into a full-scale arrest before they had probable cause. We believe that an arrest did not take place until after Agent Scott discovered the white powder in Campbell's coat pocket, and at that time probable cause existed. See *Michigan v. DeFillippo*, 443 U.S. 31, 35, 99 S.Ct. 2627, 2630–31, 61 L.Ed. 2d 343 (1979). The *Terry*-type encounter here was brief and limited in purpose to confirming or denying Scott's suspicion that Campbell was carrying narcotics. See *United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). Campbell was questioned in a public area—there is no indication of the type of movement or confinement found objectionable in *Royer*, 460 U.S. at 502–03, 103 S.Ct. at 1326–27,

("[Officers] requested him to accompany them to the police room. Royer went with them. He found himself in a small [closet-like] room. He was alone with two police officers ..."). We cannot say that the detention exceeded the bounds of an investigatory, *Terry*-type seizure. See *generally United States v. Jones*, 759 F.2d 633, 641–42 (8th Cir.), cert. denied, 474 U.S. 837, 106 S.Ct. 113, 88 L.Ed.2d 92 (1985).

## II.

Having concluded that the search of Campbell's coat pockets was not preceded by an impermissible seizure, Campbell cannot contend that his consent to the subsequent search was infected by an unlawful detention. *Mendenhall*, 446 U.S. at 558, 100 S.Ct. at 1879. Campbell consented to the search of his coat while he was justifiably detained on reasonable suspicion, and the products of the search are admissible against him. *Royer*, 460 U.S. at 502, 103 S.Ct. at 1326–27. Campbell maintains, however, that the circumstances surrounding his being stopped were so inherently coercive that his consent to the search his coat pockets was not freely and voluntarily given. See *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973); *United States v. Dennis*, 625 F.2d 782, 793 (8th Cir.1980).

■ The district court concluded that Campbell voluntarily consented to the search of his coat. Because the issue of consent is usually a factual one, a district court's finding of voluntariness must be accepted on appeal unless clearly erroneous. *United States v. Turpin*, 707 F.2d 332, 334 (8th Cir.1983). The court's finding is well supported by the record. There is no evidence that Agent Scott in any way threatened or coerced Campbell. Nor are we convinced that the circumstances surrounding the stop were so inherently coer-

---

7. See e.g., *United States v. Alpert*, 816 F.2d 958, 960–61 (4th Cir.1987); *United States v. Espinosa–Guerra*, 805 F.2d 1502, 1508–09 (11th Cir. 1986); *United States v. Erwin*, 803 F.2d 1505, 1509–11 (9th Cir.1986); *United States v. Williams*, 754 F.2d 672, 674 (6th Cir.1985); *United States v. Manchester*, 711 F.2d 458, 461–62

(1st Cir.1983); *United States v. Regan*, 687 F.2d 531, 536 (1st Cir.1982); *United States v. Ramirez–Cifuentes* 682 F.2d 337, 342–43 (2d Cir. 1982); *United States v. Sanford*, 658 F.2d 342, 345–46 (5th Cir. Unit B 1981), cert. denied, 455 U.S. 991, 102 S.Ct. 1618, 71 L.Ed.2d 852 (1982). But cf. *Sokolow*, 831 F.2d at 1423–24.

cive that they vitiated Campbell's consent.[8] Campbell was approached by only one agent, while another unnoticed by Campbell, waited nearby. The agents wore no uniforms and displayed no weapons and the interview took place in a public airline terminal, in exactly the place where Campbell was initially stopped. Campbell was not physically blocked or told he could not leave. Unlike the agents in *Poitier*, who told the defendant she was suspected of carrying drugs and read her *Miranda* rights, Scott simply stated he had observed Campbell "doing things that people sometimes do when they are trafficking in drugs." No *Miranda* warnings were read to Campbell. *Cf. Poitier*, 818 F.2d at 681; Campbell was neither accused of carrying drugs, *cf. Poitier*, 818 F.2d at 681 nor asked if he was carrying drugs. *Cf. United States v. Manchester*, 711 F.2d 458, 459 (1st Cir.1983). Scott did not use language or a tone of voice indicating that compliance might or would be required. He merely asked if Campbell "would mind" if he searched his shoulder bags and coat pockets. Campbell responded, "Go ahead." Although Campbell was not told he was free to disregard Scott's questions and walk away and while such warnings are considered significant in determining the voluntariness of consent, *see Schneckloth*, 412 U.S. at 231–33, 93 S.Ct. at 2049–51; (and in characterizing police-citizen encounters *see, e.g., Royer*, 460 U.S. at 501–07, 103 S.Ct. at 1326–29; *Dunaway v. New York*, 442 U.S. 200, 212 (1979); *United States v. Dyer*, 784 F.2d 812, 815 (7th Cir. 1986)), they are not determinative. *Schneckloth*, 412 U.S. at 231–33, 93 S.Ct. at 2049–51; *Mendenhall*, 446 U.S. at 555, 100 S.Ct. at 1877–78. Knowledge that a search will inevitably prove incriminating does not negate the possibility that consent is voluntary and not the product of coer-

cion. *Manchester*, 711 F.2d at 462. In the absence of evidence that Campbell's consent was involuntary or coerced, we cannot say that the district court's finding that Campbell's consent was valid is clearly erroneous.

We conclude that Campbell's fourth amendment right to be free from unreasonable seizure was not violated, and that he voluntarily consented to the search of his coat. The district court therefore properly denied Campbell's motion to suppress and we affirm his conviction.

---

8. The presence of coercion is relevant to determining not only whether there is voluntary consent but also to whether a seizure has occurred. We note that absent the finding of the district court that Scott retained the ticket and identification card, there is no other evidence of coercion to justify a conclusion that this encounter, up to and including the point in which Scott felt the suspicious bundle in Campbell's coat pocket, matured into a seizure requiring reasonable sus-

picion or probable cause. *See United States v. Mancini*, 802 F.2d 1326 (11th Cir.1986); *United States v. Dyer*, 784 F.2d 812, 815 (7th Cir.1986); *United States v. $84,000 Currency*, 717 F.2d 1090, 1095–97 (7th Cir.1983), *cert. denied*, 469 U.S. 836, 105 S.Ct. 131, 83 L.Ed.2d 71 (1984); *United States v. Black*, 675 F.2d 129 (7th Cir. 1982), *cert. denied*, 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983).