UNITED STATES of America,
Appellant,

v.

Sandra Faye JEFFERSON and Shawn
Louis Hayden, Appellees.

No. 89–2248.

United States Court of Appeals,
Eighth Circuit.

Submitted May 17, 1990.

Decided June 21, 1990.

Louis M. Fischer, Washington, D.C., for appellant.

Jack Nordby, Minneapolis, Minn., for appellees.

Before LAY, Chief Judge, HENLEY, Senior Circuit Judge, and BOWMAN, Circuit Judge.

HENLEY, Senior Circuit Judge.

The government appeals the district court's[1] suppression of statements made by defendants Shawn Louis Hayden and Sandra Faye Jefferson to a state trooper and evidence obtained from the trooper's search of a rented automobile in which they were passengers that was parked at an interstate rest area. The issue before us is

1. The Honorable Harold D. Vietor, Chief Judge, United States District Court, Southern District of Iowa.

whether a fourth amendment "seizure"[2] of the defendants had occurred after the trooper requested and retained Hayden's driver's license, Jefferson's identification card, and the automobile rental agreement; asked Hayden, the driver, to leave the automobile and be seated in a police patrol car; and then joined Hayden in the front seat of the patrol car. We hold that the defendants were seized for purposes of the fourth amendment at least by the end of this series of events. Because the trooper did not have a reasonable suspicion that the defendants were engaged in any criminal activity at the time he seized them, we conclude that the district court properly excluded from evidence the defendants' statements made after they were seized and the items found in the subsequent search of the rental car.

## I.

On March 28, 1989 Hayden agreed to a friend's request to drive from Minneapolis, Minnesota, where Hayden resided, to Omaha, Nebraska, to pick up Jefferson at a bus station and return her to Minneapolis. Hayden wanted to use a rental car for the trip, but did not have a major credit card, so he had another friend, Prestley Johnson, rent an automobile for him. The rental agreement did not, however, list Hayden as an authorized driver.

Hayden picked up Jefferson in Omaha at 4:00 a.m. on March 29 and put her two suitcases in the car trunk. The defendants began travelling back to Minneapolis, with Hayden driving and Jefferson in the front passenger seat. When it became too foggy to drive, they pulled into an interstate rest area just west of Des Moines, Iowa. Because of cold weather, Hayden left the engine running to keep warm while waiting for the fog to lift.

A uniformed and armed Iowa Highway Patrol trooper drove into the rest area at around 6:40 a.m. and noticed the defendants' automobile, which bore Minnesota license plates and a rental car decal. The trooper parked his patrol car behind the rental car and radioed the license plate number to his dispatcher, who informed him that the car was registered to a car rental company at the Minneapolis–St. Paul airport. After calling for backup from another patrolman, the trooper approached the window on the driver's side of the rental car. He testified that his purpose for going to the car was to make a "welfare check," that is, to see if the occupants were suffering from carbon monoxide poisoning or any other difficulties.

The trooper tapped on the window, awakened the defendants, and asked if they were all right. After requesting identification, he received Hayden's driver's license and Jefferson's identification card. He asked Hayden if the vehicle was a rental car, and Hayden replied that it was. The trooper asked to see the rental agreement, which Hayden produced for him. He then asked Hayden to accompany him to the patrol car. The trooper made this request while retaining possession of the items that the defendants had given him.

The trooper did not examine Hayden's driver's license, Jefferson's identification card, and the car rental agreement until he and Hayden were seated together in the front seat of the patrol car. The trooper first checked with the dispatcher to see if there were any outstanding warrants for Hayden or Jefferson and learned that there were none. Next he asked Hayden for the origin and destination of the trip, which Hayden told him. The trooper then noticed that the rental agreement named Prestley Johnson as the renter and that no one else was listed as an authorized additional driver. In response to the trooper's questions, Hayden explained that Johnson had rented the car so that he, Hayden, could pick up Jefferson in Omaha.

The trooper then returned to the rental car to question Jefferson. Jefferson said that she and Hayden had not been anywhere in particular and were not going

---

2. The fourth amendment provides, inter alia, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV (emphasis added).

anywhere in particular. Jefferson also said that she did not know Johnson.

The trooper asked Hayden for permission to search the car, but Hayden refused. Hayden asked the trooper for permission to go to the bathroom, but the trooper refused. Hayden also asked the trooper why he and Jefferson were being detained, to which the officer replied, "I'm just on a fishing expedition."

Over the police radio the trooper then obtained permission from the car rental company to impound the rental car. Although they were allowed to retrieve their personal property from the car, the defendants did not take the two suitcases out of the trunk. After impounding the car, the police conducted a purported "inventory search" of the car and its contents. Inside one of the suitcases were nine kilograms of cocaine.

In granting the defendants' motion to suppress, the district court held that when the trooper went up to the rental car and required the defendants to produce identification, they were seized within the meaning of the fourth amendment. The district court concluded that "[b]ecause the seizure was not based on any articulable and reasonable suspicion, it was unreasonable, and therefore it was in violation of the Fourth Amendment" and that "[a]ll of the physical evidence and the statements of the defendants obtained after this initial unreasonable seizure is tainted by the seizure ... and therefore is not admissible into evidence."

## II.

Ordinarily we will not reverse a district court's finding that a fourth amendment seizure occurred unless the finding is clearly erroneous. *See United States v. Archer,* 840 F.2d 567, 571 (8th Cir.), *cert. denied,* ──── U.S. ────, 109 S.Ct. 364, 102 L.Ed.2d 354, *cert. denied,* ──── U.S. ────,

109 S.Ct. 365, 102 L.Ed.2d 354 (1988). We may affirm the district court's order in this case, however, without having to address the validity of the precise holding below, which was that a seizure occurred at the point when the trooper requested identification from the defendants while they were seated in the rental car. Until the trooper was seated in the patrol car with Hayden and discovered from the rental agreement that neither Hayden nor Jefferson was listed as an authorized driver, we do not believe that trooper had any basis for even a *Terry*-type stop of the defendants, *see Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (requiring reasonable suspicion of criminal activity to justify brief and limited detention of an individual).[3] Thus, if we find that the defendants were seized as a result of *any* of the events that took place before the trooper examined the rental agreement—those events being his initial questioning of the defendants, his retaining of the defendants' identification papers while requesting that Hayden join him in the patrol car, and his seating next to Hayden in the front seat of the patrol car—then we must uphold the district court's ruling that the seizure of the defendants was unreasonable and that all evidence obtained from the subsequent questioning of the defendants and search of the car is inadmissible under the "fruit of the poisonous tree" doctrine set out in *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

A fourth amendment seizure of an individual occurs when governmental authorities "by means of physical force or show of authority ... restrain[ ] the liberty of a citizen." *Terry,* 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16. Stated another way, "the police can be said to have seized an individual 'only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Michigan v.*

---

**3.** The only information that the trooper had regarding the defendants before he examined the rental agreement was that they were parked at an interstate rest stop in a rental car from Minnesota. These facts are clearly not sufficient to establish a reasonable suspicion of

criminal activity. It was not until after the trooper examined the rental agreement and learned that neither of the defendants was an authorized driver that the trooper could have possibly had any basis for a *Terry*-type detention.

*Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) (quoting *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (plurality)).

Although there is no "litmus-paper test" for determining whether an individual has been seized for purposes of the fourth amendment, *see Florida v. Royer,* 460 U.S. 491, 506, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983) (plurality), previous cases provide some guidance here. We know from *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), that a patrolman's stopping of an automobile travelling down a road and subsequent detention of its occupants to check the motorist's driver's license and the registration of the automobile may "constitute a 'seizure' within the meaning of [the fourth amendment], even though the purpose of the stop is limited and the resulting detention quite brief." *Id.* at 653, 99 S.Ct. at 1396. *See also Michigan Dept. of State Police v. Sitz,* ── U.S. ──, 110 S.Ct. 2481, ── L.Ed.2d ── (1990) (holding "that a Fourth Amendment 'seizure' occurs when a vehicle is stopped at a checkpoint"). The facts of this case are somewhat distinguishable from *Prouse* and *Sitz,* however, because here the automobile was already stopped when the trooper approached it.

We have held that an individual was not seized under the fourth amendment when police officers approached a parked car in which he was seated and saw him place his hands down in front of the seat near the area of his feet. *See United States v. Pajari,* 715 F.2d 1378 (8th Cir.1983). In *Pajari* we determined that there was no seizure until the individual was ordered to raise his hands and leave his car. *See id.* at 1381. Other courts have held that in certain circumstances, police questioning of individuals in parked automobiles does not constitute a fourth amendment seizure. *See, e.g., United States v. Castellanos,* 731 F.2d 979, 983–84 (D.C.Cir.1984) (holding that no seizure occurred when park police officer requested identification from an individual seated in a parked automobile who appeared to be in physical distress); *cf. United States v. Adegbite,* 846 F.2d 834,

838 (2d Cir.1988) (finding no seizure when DEA agents, in plain clothes and on foot, waved down a truck that "had barely started in a parking lot, [and] moved only fifteen to twenty yards"), *cert. denied,* ── U.S. ──, 110 S.Ct. 370, 107 L.Ed.2d 356 (1989). Courts have also concluded that police questioning of occupants of parked cars can be transformed into fourth amendment seizures by the officer's actions. *See, e.g., United States v. Thompson,* 712 F.2d 1356, 1359 (11th Cir.1983) (holding a seizure occurred when officer retained occupant's driver's license while requesting that occupant give him a vial containing a white powdery substance).

Several factors have been considered by courts in determining whether an individual's encounter with governmental authorities is a fourth amendment seizure. In *Mendenhall* Justice Stewart offered the following examples of police conduct indicating a seizure has occurred: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with officer's request might be compelled." 446 U.S. at 554, 100 S.Ct. at 1877. We have also noted that in certain circumstances a consensual encounter may become a seizure if the officer retains the individual's driver's license. *See, e.g., United States v. Campbell,* 843 F.2d 1089, 1093 (8th Cir.1988). And courts have considered the time and setting of the encounter to be important factors in determining whether a seizure has occurred. *See, e.g., United States v. Battista,* 876 F.2d 201, 205 (D.C.Cir.1989) (holding that defendant was seized when roused at 6:00 a.m. in a partial state of undress).

■ Applying these principles to this case, we conclude that both Hayden and Jefferson were seized for purposes of the fourth amendment at least by the time the trooper examined the rental agreement and learned that neither of the defendants was listed as an authorized driver. The initial approach of the trooper to the rental car, his tapping on the driver's window, and his inquiry regarding the defendants' physical

condition, might not have constituted a fourth amendment seizure. *See Castellanos*, 731 F.2d at 983–84 (holding that police questioning of occupant of parked automobile who appeared to be in physical distress would not "have led a reasonable person to conclude that he was being compelled to respond and would not be free to leave," and adding that the court suspected "that a person in some sort of physical distress would feel less intimidated by police presence and a request for identification than someone who is singled out and stopped by an officer"). But the events that immediately followed this initial questioning—the trooper's request for and retention of Hayden's driver's license, Jefferson's identification card, and the car rental agreement; the trooper's request that Hayden leave the rental car and be seated in the patrol car; and the trooper's act of sitting next to Hayden in the front seat of the patrol car—transformed what may have been a consensual exchange into a situation in which " 'a reasonable person would have believed that he was not free to leave.' " *Chesternut*, 486 U.S. at 573, 108 S.Ct. at 1979 (quoting *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877). These combined actions by the trooper went well beyond what an average citizen would expect from a vehicle "safety check."

The government attempts to analogize this case to *United States v. Poitier*, 818 F.2d 679 (8th Cir.1987), *cert. denied*, 484 U.S. 1006, 108 S.Ct. 700, 98 L.Ed.2d 651 (1988), in which the court determined that a seizure had not occurred when DEA agents approached a suspected drug courier in an airport, told the suspect that they wanted to ask her some questions, and then moved the suspect out of the main concourse towards a lesser-populated waiting area for questioning. The *Poitier* court held that a seizure did not take place until the agents told the defendant that they suspected her of carrying drugs and read her *Miranda* rights. The government contends that the trooper's request for the defendants' identification while they were in the rental car and then his removal of Hayden to the patrol car for the purpose of further investigation are similar to the DEA questioning

of the suspect in *Poitier*. In the government's view, Hayden and Jefferson were not seized for purposes of the fourth amendment until the trooper began questioning Hayden in the patrol car—a point in the encounter that the government argues would correspond to the point in *Poitier* when the DEA agents informed the defendant that she was a criminal suspect.

We do not believe that the encounter between the trooper and the defendants is sufficiently like the situation in *Poitier* for that case to have much persuasive weight here. Unlike the DEA agents in *Poitier*, *see* 818 F.2d at 683, the trooper was in uniform and thus would appear to exert more authority over the defendants. The trooper also requested and retained Hayden's driver's license and Jefferson's identification card, whereas the DEA agents did not request any identification from the defendant in *Poitier*. The setting and time of the encounter here, at an interstate rest area in the early morning, created a much more isolated environment than the airport concourse in *Poitier*. The trooper initially questioned the defendants while they were seated in the rental car with the patrol car parked behind it, a parking arrangement that might have prevented the defendants from moving their car. The location where Hayden was moved after the initial questioning, a patrol car, was much more enclosed than the waiting area in *Poitier*. And finally, unlike the airport waiting area, the patrol car was police property. In sum, whereas in *Poitier* the DEA agents questioned the defendant in a well-populated public area without retaining any of her personal effects, the trooper questioned Hayden and Jefferson in a more isolated and confined setting while retaining their personal documentation for travel and then requested that Hayden remove himself to an enclosed police-controlled environment. The additional factors present in this case lead us to the conclusion that both Hayden and Jefferson were seized for fourth amendment purposes, at least by the time the trooper examined the car rental agreement while seated next to Hayden in the patrol car.

## III.

Because the trooper did not have a reasonable basis for suspicion that the defendants were engaged in criminal activity at the time they were seized, we hold that the district court did not err in excluding from the evidence the defendants' subsequent statements to the trooper and the items obtained from subsequent search of the car. The district court order is affirmed.

LAY, Chief Judge, concurring.

I fully concur in Judge Henley's opinion. The officer acted illegally, seizing the defendants, effecting an arrest without any articulable suspicion or probable cause. He did not act in good faith. He admits that the seizure and interrogation was a mere fishing expedition.

Judge Bowman's concurring opinion requires a brief response.

The fourth amendment protects the right of all of us to be left alone in our homes, our cars, and wherever we may go. If police are not deterred from illegal intrusions of privacy by excluding whatever evidence is seized, the fourth amendment will have no meaning or force. Surely an appreciation for the history and purpose of our basic freedoms will never allow emotional fear to justify an environment where there is no check on the abuse of police power.[1]

The fourth amendment protects the good guy as well as the bad. It would mean very little to anyone if it did not. The argument that since 1961 murders have doubled, rapes quadrupled, and robbery quintupled in part because of the exclusionary rule is a statement more fitting for headlines of the National Enquirer. It is irrational hyperbole totally unsupported in fact or in law.

Others have attacked the exclusionary rule.[2] The rule serves one purpose—deterrence. *United States v. Janis*, 428 U.S. 433, 446, 96 S.Ct. 3021, 3028, 49 L.Ed.2d 1046 (1976). In recent years, it has been severely modified. *See, e.g., United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (good faith exception). However, Justice Clark wrote for the Court in *Mapp v. Ohio*, 367 U.S. 643, 656, 81 S.Ct. 1684, 1692, 6 L.Ed.2d 1081 (1961), that the exclusionary rule was both "logically and constitutionally necessary." He observed the doctrine was "an essential part of the right to privacy" and was "an essential ingredient of the right" to be free from unreasonable searches and seizure. *Id.* He then concluded, "to hold otherwise is to grant the right but in reality to withhold its privilege." *Id.* All of this makes a great deal of sense to me. But whether this court agrees with this analysis is immaterial. It is the law and must be followed. I would prefer to leave the philosophical debate to the Supreme Court or the Congress.

---

1. A recent thorough study of the deterrent effect of the exclusionary rule among Chicago narcotics officers concluded that the officers respect the rule and have learned to follow proper search and seizure procedures. Orfield, *The Exclusionary Rule and Deterrence: An Empirical Study of Chicago Narcotics Officers*, 54 U.Chi.L.Rev. 1016 (1987). The head of the Narcotics Section of the Organized Crime Division of the Chicago Police Department stated:

> I would not do anything to the exclusionary rule. In my personal opinion it is not a detriment to police work. In fact the opposite is true. It makes the police department more professional. It enforces appropriate standards of behavior. * * * In this unit, seldom if ever does the law of search and seizure keep us from making the searches we should be able to make.

*Id.* at 1016. The officers themselves expressed understanding for the rule. One remarked, "[i]f you abolished the exclusionary rule you would

be turning the police department loose. It would be like a military state of some sort. That situation has enormous possibility for abuse." *Id.* at 1051.

The study found that when evidence was suppressed, the officer was usually in court to hear why. To ensure his understanding, the officer was required to file a report with his superior and explain the reasons for the suppression. Repeated suppressions damaged an officer's chances for promotion. The overwhelming evidence was that since *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), Chicago narcotics officers dramatically increased their use of search warrants, and had learned to be especially careful when they found it necessary to proceed without a warrant.

2. *See, e.g., Stone v. Powell*, 428 U.S. 465, 496, 96 S.Ct. 3037, 3053, 49 L.Ed.2d 1067 (1976) (Burger, C.J., concurring).

BOWMAN, Circuit Judge, concurring.

This case vividly illustrates the perversity of the exclusionary rule. Here, an officer's educated hunch led to the discovery of evidence (nine kilograms of cocaine) of substantial criminal activity. This discovery occurred as a result of information the officer developed by asking questions and examining documents in the course of his routine check of a parked car and its occupants at a highway rest stop. The ordinary law-abiding citizen, I believe, would think the officer should be commended for his fine work, and the cocaine dealers punished. Instead, because we hold (as I agree, under the existing case law, we must) that a "seizure" within the meaning of the Fourth Amendment occurred before the officer had formed an objectively reasonable basis for suspecting the defendants of criminal activity, the exclusionary rule requires that the evidence be suppressed. The defendants thus exit unpunished, free to continue dealing illegal drugs to the pathetic addicts and contemptible scofflaws who comprise the national market for these substances. As for the officer, far from his being commended, it is judicially recorded that he blundered, and the point once again is driven home that legalistic observance of even the most technical of the judge-created rules of search and seizure—rules which, like the Fourth Amendment itself, seek to protect law-abiding citizens from intrusive conduct by officers of the state—is more important than intelligent, courageous, and vigorous initiative to expose criminal activity and bring those responsible for it to the bar of justice.

It has been reported that since 1961, when in *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), the Supreme Court extended the federal exclusionary rule to the state courts, "the murder rate has doubled, rape has quadrupled and robbery has quintupled." *Wall St. J.,* May 7, 1990, at A14, Col. 1. While it would be foolish to blame the exclusionary rule for all of this alarming increase in violent crime, I believe it is equally foolish to pretend that the exclusionary rule, and the *zeitgeist* it has created, is to blame for none of it.

The time has come, it seems to me, for a serious reexamination of the exclusionary rule—its benefits, its costs, its consequences for the safety of our citizens, and its impact upon their confidence in the system of criminal justice their tax dollars support. This Court, however, is not the forum in which such a reexamination can take place. I therefore concur in today's decision.